891 A.2d 430

**WESTON BUILDERS & DEVELOPERS, INC.**

v.

**McBERRY, LLC.**

**No. 13 Sept. Term, 2005.**

Court of Special Appeals of Maryland.

Feb. 1, 2006.

28

---

Melvin J. Sykes, Baltimore (Lloyd J. Snow, Baltimore, Michael P. Darrow, Annapolis, on the brief), for Appellant.

Stephen P. Fitzgerald, LaPlata, for Appellee.

Panel: MURPHY, C.J., JAMES R. EYLER and
CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

CHARLES E. MOYLAN, JR., Judge (retired, specially assigned).

## I. The Threshold Question of Mootness

The appellee, McBerry, LLC ("McBerry"), asks us to dismiss this appeal for mootness. The appellant, Weston Builders & Developers, Inc. ("Weston"), has filed a Response in Opposition. The resolution of this threshold issue ironically requires us to address issues as challenging as those raised in the main appeal itself.

On March 7, 2002, Weston and McBerry entered into a contract in which McBerry agreed to sell and Weston agreed to buy forty-six (46) building lots in Charles County. On May 25, 2004, Weston filed an Amended Complaint seeking, *inter alia*, specific performance of the contract. After a three-day non-jury trial in the Circuit Court for Charles County, the trial judge, on February 2, 2005, granted McBerry's motion for judgment, and on February 8, judgment was entered in favor of McBerry. Weston filed this appeal on March 4.

During the pendency of the appeal, McBerry, on October 7, 2005, deeded all 46 of the lots to Maryland Homes, PF. McBerry now claims that because the property has been sold to a bona fide third party purchaser, the relief sought by Weston can no longer be granted and that the appeal, therefore, is moot. Weston parries with the Doctrine of *Lis Pendens*, by virtue of which the purchaser would not have been fully protected.

### Lis Pendens, Generally

*Lis pendens* is a common law doctrine. Literally, it is Latin for "lawsuit pending." It has given rise to the maxim *Pendente lite nihil innovetur* ("During the pendency of a litigation, nothing new shall be introduced."). *Inloes v. Harvey,* 11 Md. 519, 525 (1857). The obviously related adverbial phrase "pen-

dente lite" is etymologically indistinguishable but, legally, enjoys far wider applicability. The two related but distinct purposes of *lis pendens* are revealed by definitions 2 and 3 of it in *Black's Law Dictionary* (7th ed. 1999):

2. The jurisdiction, power, or control acquired by a court over property while a legal action is pending.

3. A notice, recorded in the chain of title to real property, required or permitted in some jurisdictions to warn all persons that certain property is the subject matter of litigation, and that any interests acquired during the pendency of the suit are subject to its outcome.

2 J. Pomeroy, *A Treatise on Equity Jurisprudence*, § 632 (5th ed. S. Symons 1941), pp. 727–28, states the undergirding rationale:

[T]he law does not allow litigant parties to give to others, pending the litigation, rights to the property in dispute, so as to prejudice the opposite party. *Where a litigation is pending between a plaintiff and a defendant as to the right to a particular estate, the necessities of mankind require that the decision of the court in the suit shall be binding, not only on the litigant parties, but also on those who derive title under them by alienations made pending the suit, whether such alienees had or had not notice of the pending proceedings.* . . . [It is upon this principle of public policy, the object of which is to prevent parties from making a conveyance *pendente lite* of the property or thing which is the subject-matter of the controversy and thus defeat the execution of the court's decree, that the weight of modern authority bases the doctrine of *lis pendens.*]

(Emphasis supplied). See also *Creative Development Corp. v. Bond*, 34 Md.App. 279, 284, 367 A.2d 566 (1976).

In § 633, p. 730, Professor Pomeroy sets forth the general rule of *lis pendens:*

"[T]he general and established rule is," using the language carefully chosen by Chancellor Kent in a leading case, "that a *lis pendens*—a pending suit in equity—duly prosecuted, and not collusive, *is notice to a purchaser of the property in*

> *dispute from a party to the litigation, so as to affect and bind his interest by the decree; and the lis pendens begins from the service of the subpoena after the bill is filed."* Wherever, therefore, an equitable suit affecting the title to a particular estate as its subject-matter has been begun by service of process, and is prosecuted in good faith, whether we say that the *lis pendens* is constructive notice to all the world, or regard the doctrine as necessarily resting upon a basis of expediency, the result is the same; *an alienee of the subject-matter from either party during the pendency of the suit takes it subject to the rights of the other party involved in the controversy, and is bound by the decree or judgment finally rendered.*

(Emphasis supplied).

Depending upon the issue before the court in the case of the hour, appellate opinions fluctuate between looking to 1) notice to prospective purchasers and 2) the control of the courts over property while litigation is pending as the undergirding purpose of *lis pendens.* Both, of course, are part of the *raison d'etre,* and the emphasis will shift from one to the other depending on the analytic need of the moment. 5 Herbert T. Tiffany, *The Law of Real Property,* § 1294 (3rd ed. 1939), offered its take on the generative purpose:

> The doctrine of lis pendens by which one purchasing land from a party to a pending litigation concerning such land takes subject to the results of such litigation, is properly based, it would seem, not on the theory that such purchaser has notice of the adverse claim, but rather on the principle that, pending the litigation, a party thereto cannot transfer his rights in the land to others, so as to prejudice another party to the litigation, since otherwise the decision might be utterly ineffectual.

Maryland is one of a handful of states that recognize *lis pendens* in its common law form. Janice Gregg Levy, Comment, *"Lis Pendens* and Procedural Due Process: A Closer Look After *Connecticut v. Doehr,"* 51 Md. L. Rev. 1054, 1087 (1992). Albeit without expressly using the phrase *"lis pen-*

*dens*" (at least in noun form), the Court of Appeals nonetheless applied the doctrine as early as 1823 in *Tongue v. Morton*, 6 H. & J. 21, 23–24:

> And upon principle, it would seem fit that *persons who come into the possession of the land pendente lite*, claiming title to it under the parties to the bill, ... *should stand in the same predicament with those whom they represent* in point of interest, on the ground that *their condition cannot be better than that of those under whose authority they have obtained the possession.*

(Emphasis supplied).

The Court of Appeals referred to *lis pendens* by name in *Feigley v. Feigley*, 7 Md. 537, 563 (1855), and, as of *Inloes v. Harvey*, 11 Md. at 524–25 in 1857, it was quoting fully from 1 Joseph Story, *Equity Jurisprudence*, § 406.

> "Ordinarily, it is true, that the decree of a court binds only the parties and their privies in representation or estate. But *he who purchases during the pendency of a suit, is held bound by the decree that may be made against the person from whom he derives title.* The litigating parties are exempted from taking notice of the title so acquired; and such purchaser need not be made a party to the suit. Where there is a real and fair purchase without any notice, the rule may operate very hardly. But *it is a rule founded upon a great public policy, for otherwise, alienations made during a suit might defeat its whole purpose;* and there would be no end to litigation. *And hence arises the maxim, pendente lite nihil innovetur; the effect of which is, not to annul the conveyance, but only to render it subservient to the rights of the parties in litigation. As to the rights of these parties, the conveyance is treated as if it never had any existence; and it does not vary them.*"

(Emphasis supplied).

In the intervening 150 years, the Court of Appeals has routinely recognized and applied the doctrine of *lis pendens*. *Applegarth v. Russell*, 25 Md. 317, 320–21 (1866); *Hall v. Jack*, 32 Md. 253, 264–65 (1870); *Stockett v. Goodman*, 47 Md.

54, 60 (1877); *Sanders v. McDonald,* 63 Md. 503, 509 (1885); *Taylor v. Carroll,* 89 Md. 32, 36, 42 A. 920 (1899); *Walzl v. King,* 113 Md. 550, 556, 77 A. 1117 (1910); *Rupp v. Rogers,* 118 Md. 534, 85 A. 774 (1912); *Corey v. Carback,* 201 Md. 389, 403–04, 94 A.2d 629 (1953). See also *Price v. McDonald,* 1 Md. 403, 412 (1851).

In the last 30 years, this Court has also consistently applied the doctrine. *Creative Development Corp. v. Bond,* 34 Md. App. 279, 283–85, 367 A.2d 566 (1976); *Amabile v. Winkles,* 34 Md.App. 435, 439, 367 A.2d 58 (1977); *Angelos v. Maryland Casualty Co.,* 38 Md.App. 265, 268, 380 A.2d 646 (1977); *Kirkpatrick v. Gilchrist,* 56 Md.App. 242, 248 n. 2, 467 A.2d 562 (1983); *Fiol v. Howard County Board of Appeals,* 67 Md.App. 595, 603–04, 508 A.2d 1005 (1986); *Permanent Financial Corp. v. Taro,* 71 Md.App. 489, 492–95, 526 A.2d 611 (1987), *cert. granted,* 311 Md. 193, 533 A.2d 670 (1987), *appeal dismissed,* January 26, 1988; *Warfel v. Brady,* 95 Md.App. 1, 7–8, 619 A.2d 171, *cert. denied,* 331 Md. 88, 626 A.2d 371 (1993).

The truly definitive analysis of *lis pendens* in Maryland, however, had to await the opinion by Judge Bell (now Chief Judge Bell) for the Court of Appeals in *DeShields v. Broadwater,* 338 Md. 422, 432–42, 659 A.2d 300 (1995). The Court of Appeals discussed, *inter alia,* two of the key requirements for the attachment of the doctrine, both of which have been indisputably satisfied by Weston in the case before us. The *lis pendens* doctrine, at least in Maryland, applies exclusively to proceedings involving real property. Judge Bell explained, 338 Md. at 435, 659 A.2d 300.

> *Lis pendens* has no applicability ... except to proceedings directly relating to the title to the property transferred or in which the ultimate interest and object is to subject the property in question to the disposal of a decree of the court.

See also *Corey v. Carback,* 201 Md. at 403, 94 A.2d 629; *Applegarth v. Russell,* 25 Md. at 321; *Feigley v. Feigley,* 7 Md. at 563; *Warfel v. Brady,* 95 Md.App. at 8, 619 A.2d 171.

Indeed, Maryland Rule 12–102(a),[1] describing the scope of *lis pendens* in Maryland, expressly restricts that scope to actions affecting real property.

> (a) **Scope.** *This Rule applies to an action* filed in a circuit court or in the United States District Court for the District of Maryland *that affects title to or a leasehold interest in real property* located in this State.

(Emphasis supplied). Subsection (b) again refers to real property:

> In an action to which the doctrine of lis pendens applies, the filing of the complaint is constructive *notice of the lis pendens as to real property* in the county in which the complaint is filed.[2]

(Emphasis supplied). See *Permanent Financial Corp. v. Taro*, 71 Md.App. at 495, 526 A.2d 611 ("We believe . . . that the BD Rules [now Rule 12–102] implicitly acknowledge that *the doctrine of lis pendens,* as applied in Maryland, *will*

---

1. The Maryland Rules, then as Rules BD 1, 2, 3, and 4, first addressed the subject of *lis pendens* on January 1, 1962. The BD Rules became the present Rule 12–102 on January 1, 1997.

2. On December 15, 2005, the Court of Appeals filed its opinion in *Greenpoint Mortgage Funding, Inc. v. Schlossberg,* 390 Md. 211, 888 A.2d 297 (2004). Whereas the case now before us is governed by the first sentence of Maryland Rule 12–102(b), providing that the filing of a complaint is *ipso facto* constructive notice of *lis pendens* as to real property in the country in which the complaint is filed, *Greenpoint v. Schlossberg* is controlled by the second sentence of that subsection:

> In any other county, there is constructive notice only after the party seeking the lis pendens *files* either a certified copy of the complaint or *a notice giving rise to the lis pendens,* with the clerk in the other county.

(Emphasis supplied).

A divorce action with possible repercussions affecting real property was pending in Washington County, but the real property was located in Montgomery and Prince George's Counties. The question before the Court of Appeals was that of who should bear the risk of loss when a clerk in the "other" county misindexes a Notice of *Lis Pendens.*

In the beginning of the respective analyses, both the opinion of Judge Cathell for the four-judge majority and the opinion of Judge Wilner for the three-judge dissent provide edifying insight into the common law origins of the *lis pendens* doctrine and into the early reception of the doctrine in Maryland.

*operate against only real or leasehold property ...").* (Emphasis supplied).

Weston's demand for specific performance, whereby McBerry would be "ordered to transfer the title and possession of the aforesaid property Lots to plaintiff," was most assuredly litigation affecting real property. Because, moreover, both the locus of the property and the forum for the lawsuit are in Charles County, we look to the first sentence of Maryland Rule 12–102(b), which provides that "the filing of the complaint" itself was all that was required to put all potential alienees of the property on constructive notice of *lis pendens.* The full subsection reads:

> (b) **Creation—Constructive notice.** In an action to which the doctrine of lis pendens applies, *the filing of the complaint is constructive notice of the lis pendens as to real property in the county in which the complaint is filed.* In any other county, there is constructive notice only after the party seeking the lis pendens files either a certified copy of the complaint or a notice giving rise to the lis pendens, with the clerk in the other county.

(Emphasis supplied).

■ The second key requirement for the attachment of *lis pendens* described by *DeShields v. Broadwater* is the initiation of notice. The filing of the legal action is the trigger. If the filing of the claim precedes the alienation of the property, the alienee (and, indeed, all of Charles County) have been put on notice of *lis pendens* and, accordingly, the alienee takes the property subject to a cloud on the title. If, on the other hand, the alienation of the property precedes the filing of the claim, *lis pendens* does not apply. Judge Bell, 338 Md. at 435–36, 659 A.2d 300, made the timing of the attachment of the doctrine very clear.

> *Unless the transfer of the property occurs after the suit which provides lis pendens notice is filed, the doctrine does not apply.*

> Because *lis pendens is triggered by the initiation of litigation affecting the title to real property,* ordinarily

whether the plaintiff in that litigation has knowledge of the transfer of the property is not an issue. Thus, *when, after the complaint has been filed, the defendant transfers his or her interest in the property* which is the subject of the lawsuit, *lis pendens applies* to subject that property to the result of the pending litigation whether or not the plaintiff is aware of the transfer.... As we have seen, *where the defendant's interest in the property is transferred prior to the initiation of the action affecting title to that property, lis pendens does not apply.*

(Emphasis supplied). See also *Angelos v. Maryland Casualty Co.,* 38 Md.App. at 268, 380 A.2d 646 ("Angelos's property interest was acquired through a mortgage obtained prior to the commencement of the litigation upon which Maryland Casualty's *lis pendens* claim rests, and therefore is not subject to the operation of the doctrine."); *Hall v. Jack,* 32 Md. at 263–64 ("In order to be entitled to intervene in the suit or claim title to the property, it ought to appear affirmatively that his title as assignee, or that of McKenzie under whom he claims, was acquired before the pendency of the suit. If acquired after suit brought, he is affected by the *lis pendens.*").

In this case, the front-end timing was no bar to the attachment of *lis pendens.* The claim for specific performance was filed by Weston on May 11, 2004. The 46 lots that were the subject of the suit were sold by McBerry to Maryland Homes, PF on October 7, 2005. The pertinent challenge to the vitality of *lis pendens* involves not a question of when it became operational, but of how long it remained so.

### The Continuing Vitality of *Lis Pendens* Through the Appellate Process

Deferring for the moment any consideration of the possible impact of extrinsic factors such as supersedeas bonds or stays of enforcement or execution, we will first examine the natural life span of *lis pendens.* Unaffected by outside procedural events, will it, in the ordinary course of events, expire with the rendering of a *nisi prius* judgment in the suit that gave birth to it? Or will it retain its vitality through the continuation of

the entire litigation, to wit, through the end of the appellate process?

■ It is clear that *lis pendens* does not die a natural death as the curtain falls on the *nisi prius* proceedings. Indeed, there are resonances of Newton's First Law of Motion in the legal principle that *lis pendens,* once in motion, will continue in motion in the same direction and with the same operational effect unless acted upon by a force. *Pomeroy's Equity Jurisprudence,* § 634b, pp. 739–40, describes generally the continuing efficacy of *lis pendens* through the end of the appellate process.

> Even a judgment in favor of the defendant does not necessarily at once terminate the *lis pendens. If the unsuccessful party is entitled to appeal, the constructive notice continues during a reasonable time for an appeal to be taken.* This is on the ground that where the law gives a right of review to an appellate court, all persons are necessarily charged with notice thereof, and *lis pendens is adequate to give a litigant protection until he can pursue all the remedies to which he is entitled in the action.*

(Emphasis supplied).

The standard legal encyclopedias uniformly speak to the same effect. 51 *American Jurisprudence* 2d 729, "Lis Pendens," § 67, states:

> The decisions contain numerous examples of situations in which *a person who purchases property after the entry of the judgment of the trial court* in an action affecting the property, within contemplation of the doctrine of lis pendens, *and also after review proceedings have been formally initiated, is looked on as a pendente lite purchaser,* in the sense that he takes the property subject to the outcome of the review proceedings. Also, *it is generally held that lis pendens continues to be effective after a judgment and pending appeal.*

(Emphasis supplied).

54 *Corpus Juris Secundum* 518–19, "Lis Pendens," § 30, similarly confirms the continuing vitality of the doctrine through the appeals process.

*Lis pendens operates until the time to ask for or seek an appeal has expired.* Thus a valid notice of lis pendens remains effective as constructive notice of the action referred to therein only until the time for appeal therefrom has ended.

Additionally, *once appeal has been requested, lis pendens continues to be effective after judgment and pending appeal.*

(Emphasis supplied).

In *Annotation, "Lis Pendens: Grounds for Cancellation Prior to Termination of Underlying Action, Absent Claim of Delay,"* 49 A.L.R.4th 242, 247, it is observed:

As a general rule, *once the doctrine of lis pendens comes into operation* with respect to particular litigation, *it remains in operation until the rendition of a final decision* that puts a definite end to the litigation.

(Emphasis supplied).

The caselaw confirming the continuing vitality of *lis pendens* through the appeal process, albeit scant, is unwavering. The Supreme Court of Michigan described that vitality in *Maedel v. Wies,* 309 Mich. 424, 429, 15 N.W.2d 692, 694 (1944):

*The effect of the suit,* and the filing of the requisite notice under the statute upon purchaser or mortgagors pendente lite, *continues through the entire time of its pendency, and ends when the suit is actually ended by a final decree.*

. . . .

*The notice of lis pendens, once filed, continues in effect during the time allowed for appeal and during consideration by this court of such appeal, and can only be terminated by a final decree.*

(Emphasis supplied).

The Supreme Court of Kansas wrote to the same effect in *Kremer v. Schutz,* 82 Kan. 175, 107 P. 780, 781 (1910).

When the divorce proceeding was begun in which Mrs. Kremer made a distinct claim to the land as her separate property, it was lis pendens as to one who leased or

otherwise acquired a right in the land during the litigation. *While the judgment of the district court* awarding the land to John L. Kremer *was what is termed a final judgment, it was subject to appeal,* and an appeal was, in fact, taken from the judgment before the lease was executed. In contracting for the use of the land on the basis of that judgment, Schutz was bound to know that it was subject to appeal, and that an appeal had been taken. *The litigation had not ended in the rendition of the judgment,* and; although it may have seemed to Schutz that Mr. Kremer might ultimately win, *he still took the risk of a reversal and of the final outcome of the litigation.*

(Emphasis supplied). See also *Pachner v. Hoppas,* 119 Kan. 415, 239 P. 967 (1925).

As early as 1900, the Supreme Court of Iowa had relied on that same continuing vitality in *Olson v. Leibpke,* 110 Iowa 594, 81 N.W. 801, 802.

The primary object of the rule of lis pendens is to keep the property within the power of the court until final judgment or decree shall be entered.... *The rule under the common law,* and the rule which has been generally followed by the courts where there is no statute affecting the question, *is that lis pendens continues until the suit is determined by final decree,* or until it is suspended by failure to make what is called a "full prosecution." It is also held that *an appeal from a final judgment of an inferior court continues the lis pendens during the pendency of the appeal.*

(Emphasis supplied).

The Supreme Court of Indiana, in *Dunnington v. Elston,* 101 Ind. 373 (1885), held squarely that *lis pendens* notice continues unabated through the appellate phase of a litigation. The plaintiff in that case brought a suit in ejectment but lost at the trial court level. Following that judgment in the trial court, the successful defendant sold the real property in question to a third party. The plaintiff subsequently filed a timely appeal, and the Indiana Supreme Court reversed the judgment of the trial court. In the subsequent battle between

the original plaintiff and the third-party purchaser, the Supreme Court held that the *lis pendens* notice continued in full force through the appeals process and that the purchaser took the property subject to the full risk that the trial court's judgment might be reversed on appeal.

> [*The purchaser*] *took his title within the time in which by law* [*the plaintiff*] *had the right to appeal,* and thereby he took the hazard of the appeal and the reversal of the judgment, and *now that the appeal was taken, and the judgment under which he claims is reversed, he can not say he was a purchaser in good faith* and invoke the aid of the statute.

> A construction of the statute such as the appellant contends for would practically destroy the right of appeal in cases where the title to land is involved, by putting it within the power of the prevailing party below to render an appeal unavailing by a transfer of the title.

(Emphasis supplied).

 We are guilty, however, of gilding the lily. To support the conclusion that *lis pendens* in Maryland is not automatically terminated by a judgment in the circuit court, one need look no further than Maryland Rule 12–102 itself. Subsection (c) deals in detail with when and how such a termination may be effected. Significantly, subsections (1) and (2) treat differently two distinct stages of the litigation.

(1) While action is pending.

(2) Upon conclusion of action.

Our concern in this case is with sub-subsection (2). It does not provide that *lis pendens* is automatically terminated "upon conclusion of action" at the *nisi prius* level. It does not provide that *lis pendens* ever terminates automatically. It sets out, rather, three precise sets of circumstances under which *lis pendens* may be terminated, if (but only if) certain further procedural steps are taken. Necessarily implicit in subsection (c) is that if none of those three sets of circumstances is present, the *lis pendens* will continue in full force. The three sets of circumstances are:

(A) the action is dismissed, or

(B) judgment is entered in favor of the defendant and

 [1] a timely appeal is not taken, or

 [2] the judgment is affirmed on appeal, or

(C) judgment in favor of the plaintiff is reversed on appeal, vacated, or satisfied. . . .

Even if one of those sets of circumstances obtains, moreover, subsection (c) goes on to provide two alternative procedural modalities by which the *lis pendens* may then be formally terminated:

[1] [T]he plaintiff shall file a certified copy of the appropriate docket entry with the clerk in each county in which a certified copy of the complaint or notice was filed pursuant to section (b) of this Rule. [2] *If the plaintiff fails to comply* with this subsection, *the court* with jurisdiction over the action, *on motion of any person in interest* and upon such notice as the court deems appropriate in the circumstances, *may enter an order terminating the lis pendens.*

(Emphasis supplied).

What is now Rule 12–102(c) replaced former Rule BD3 on January 1, 1997. The new rule distinguished for the first time between 1) terminating *lis pendens* "while action is pending" and 2) terminating *lis pendens* "upon conclusion of action." In the latter situation, the new rule for the first time also specified those circumstances under which *lis pendens* could be terminated at the conclusion of the action. In the 132nd Report of the Rules Committee to the Court of Appeals, dated November 6, 1995, the Reporter's Note commented on the new provisions controlling termination.

In subsection (c)(1) the Committee has provided a motion procedure for seeking termination of the lis pendens during the pendency of the action. The motion must be filed in the court in which the action is pending, even when the movant is seeking termination of the lis pendens in another county. *Subsection (c)(2) prescribes the procedure for terminating the lis pendens after conclusion of the action by one of the specified events.* The burden of notifying other counties in

which constructive notice of the lis pendens has been established pursuant to section (b) of the rule is imposed on the plaintiff. The motion procedure applicable in the event the plaintiff fails to comply with the subsection essentially tracks the procedure set forth in Rule 2–626 (Satisfaction of Judgment). It also is similar to the procedures currently prescribed by the Codes of New Jersey and New York. (Emphasis supplied).

In this case, the purchaser of the 46 lots on October 7, 2005, is twice bereft in terms of still being on notice of the potential cloud on the title. None of the three sets of circumstances listed in Rule 12–102(c)(2) came to pass. Under sub-subsection (B), judgment had been entered in the circuit court in favor of the defendant, McBerry, but 1) an appeal by Weston had been taken and 2) the circuit court's judgment has not been affirmed on appeal. The only remotely pertinent precondition for a termination of *lis pendens* thus did not apply.

Even if, however, the analysis could go on, *arguendo*, to the required procedural perfecting of a termination, the trial judge did not "enter an order terminating the lis pendens." Indeed, the trial judge expressly declined to do so. The circuit court order entering judgment in favor of the defendant, McBerry, had been entered on February 8, 2005. On March 31, McBerry moved to have the court terminate *lis pendens*, pursuant to Rule 12–102(c). It expressly asked for a further order stating that "McBerry, LLC shall have the authority to convey any or all of lots numbered one (1) through forty-six (46) . . . to any subsequent party free and clear of any claim by Weston." Following a hearing on June 16, the court denied the Motion to Terminate *Lis Pendens*.[3]

The *lis pendens* that attached on May 25, 2004, with the filing of Weston's Amended Complaint did not languish and die of its own accord following the circuit court judgment against Weston on February 8, 2005. Nor did it die by action

---

3. Even if the trial court had granted the motion, it appears to us that it would have been error, for none of the necessary preconditions for terminating *lis pendens* had been shown to exist.

of law, for a Motion to Terminate it was never granted. If a *lis pendens* is to be terminated, it can only be done pursuant to Rule 12–102(c). It was not. How then does McBerry argue that *lis pendens* was not alive and well on October 7, 2005?

### Does the Continuation of *Lis Pendens* Through Appeal Depend upon a Stay of Enforcement or Execution?

With apology to Sir Isaac Newton, we earlier observed that a *lis pendens*, once in motion, will continue in motion unless acted upon by a force. We turn finally, on this threshold issue, to whether the motion of the *lis pendens* in this case was acted upon, and thereby terminated, by such a force. The thrust of McBerry's contention is that the legal necessity for Weston to have filed a supersedeas bond and to have obtained a stay of enforcement represents such a terminating force. McBerry totally ignores Rule 12–102(c) and travels down a completely unrelated procedural road.

McBerry's argument, in a nutshell, is as follows: If a plaintiff making a claim affecting real property, and enjoying the benefit of *lis pendens* during the trial stage of the suit, loses at the trial stage and takes an appeal, *lis pendens* will be automatically terminated unless the plaintiff obtains a stay of enforcement, generally supported by a supersedeas bond. Rule 12–102(c), of course, says no such thing. In its Motion to Dismiss the Appeal, McBerry argues:

*The posting of the supersedeas bond* as required under Maryland Rules 8–422 and 8–423 *could have stayed the effect of the final judgment*[4] entered by the trial court on February 8, 2005 and prevented McBerry from selling the subject property. Weston, however, either neglected or declined to file the bond; McBerry, therefore, was entitled

---

4. If the effect of the final judgment was to deny the plaintiff specific performance, how does one stay the effect of that except by granting specific performance? The argument is doubletalk.

to move forward on the judgment entered by the trial court, and sold the property.

■ It is difficult to get a firm grip on McBerry's argument for many reasons. One of them is that the language is perplexingly slippery. To begin with, a supersedeas bond and a stay of enforcement or execution are not identical terms, although the two are frequently and casually used interchangeably. Obtaining a supersedeas bond is generally a precondition for getting a stay of execution, but not invariably so. Rule 8–422(a), for instance, provides that "an appellant may stay the enforcement of [a] civil judgment from which an appeal is taken by filing with the clerk ... [1] a supersedeas bond under Rule 8–423, [2] alternative security as prescribed by Rule 1–402(e), or [3] other security as provided in Rule 8–424." Our point is simply that although 1) "supersedeas bond" and 2) "stay of enforcement of judgment" are closely related terms, they are by no means identical or interchangeable.[5] It is a "stay of enforcement of a judgment" that we should be focusing on. A supersedeas bond is simply a frequent precondition for obtaining such a stay.

The bigger linguistic snare is the insouciantly casual use of the word "stay." Cut loose from its limiting context, it can mean almost anything. As a term of art, "stay," either as a noun or as a verb, should be tied to a precise predicate, but McBerry allows it to float free. The procedure we are dealing with is a "stay of enforcement of judgment," sometimes referred to as a "stay of execution." We are not dealing with a plenary stay of anything or everything. The Maryland Rules invoked by McBerry are concerned only with staying the enforcement of a judgment. Most emphatically for present purposes, a "stay" does not trigger a universal freeze of the status quo.[6]

---

5. An excellent review of the history of supersedeas bonds in Maryland, from ch. 4 of the Acts of 1713 through 1987, was that done by Judge McAuliffe in *O'Donnell v. McGann*, 310 Md. 342, 529 A.2d 372 (1987).

6. The inherent discretionary power of an appellate court "to stay proceedings" and "to make any order appropriate to preserve the status

██ A judgment, the enforcement of which may be subjected to a stay, is a court decision in favor of a party, generally the plaintiff, entitling that party to a very particular form of relief, such as a money judgment, the foreclosure of a mortgage, the appointment of a trustee to make a judicial sale. The prevailing party, in order to enjoy the benefit of that judgment, sometimes requires some further order of the court, by way of directing a clerk or a trustee or a sheriff to enforce or execute on the judgment. Such officially ordered actions are the subject matter of stays of enforcement of or execution upon a judgment.

We can better appreciate the coverage of a particular rule if we take a long view of the larger body of rules of which it is a part. As part of Title 2 of the Rules, dealing with "Civil Procedure—Circuit Court," Chapter 600 deals with "Judgment." Rules 2–633, 2–647, 2–648, 2–651, and 2–652 deal with various modalities of enforcing a judgment, not here pertinent. Rules 2–641 and 2–642 deal with writs of execution directed to the sheriff to assist a party in enforcing a judgment in its favor. Rule 2–631 deals generally with "Enforcement procedures available" and limits the meaning of enforceable judgments.

Judgments may be enforced only as authorized by these rules or by statute.

It is Rule 2–632 that deals with the subject of "Stay of enforcement." Subsection (e) provides that "a stay pending appeal is governed by Rules 8–422 through 8–424." Rule 8–422, in turn, deals with, during the pendency of an appeal, a "Stay of enforcement of judgment." It is clear that the

quo"; recognized by Rule 2–632(g), has no bearing on this case. It refers only to a stay ordered by an appellate court, not one by a trial court. Rule 2–632(g) provides:

*The provisions of this Rule do not limit any power of an appellate court to stay proceedings during the pendency of an appeal or to suspend, modify, restore, or grant an injunction during the pendency of an appeal or to make any order appropriate to preserve the status quo or the effectiveness of the judgment subsequently to be entered.*

(Emphasis supplied).

modalities of enforcement that may be stayed pursuant to Rule 8–422 are those modalities specifically spelled out by Chapter 600 dealing with "Judgment." It is generally a successful plaintiff who invokes official help to enforce a judgment and a beleaguered defendant who seeks to forestall such enforcement by obtaining a stay.

If, by way of contrast, the judgment in the circuit court were, as in this case, for a defendant, denying a plaintiff's request for a particular relief, such a judgment would be self-executing. There would be nothing to be enforced. There could be, by definition, no enforcement to be stayed. In such a procedural scenario, the very notion of a stay of enforcement is meaningless.

McBerry's position, nonetheless, is that Weston was somehow obligated, lest the *lis pendens* automatically terminate, to obtain an order freezing the status quo. There is no such cognizable order, and McBerry points us to no statutory or common law source for such an order. What, moreover, should such a stay forbid, the better to preserve the status quo? Would it only forbid McBerry to sell the land? Or would it also forbid McBerry to lease the land, to mortgage the land, to encumber the land with easements, to permit others to mine ore from beneath its surface or to harvest timber or crops from its surface? On the basis of which of such countless possibilities should the cost of a supersedeas bond be computed? The Earth will not stand still because one stays the enforcement of a judgment.

Would such alterations to the status quo by a private litigant, moreover, constitute the enforcement of a judgment within the contemplation of the rules permitting such enforcement to be stayed? If the judgment was not a court order that the land should be sold (it was not), how would staying the sale of the land be a stay of the enforcement of the judgment? All of these and incalculable other potential disruptions of the status quo are not, we hold, actions within the coverage of Chapter 600 of Title 2 of the Maryland Rules

authorizing **a stay of the enforcement of a judgment,** and that is the only "stay" that we recognize.[7]

The Supreme Court of Utah in *Hidden Meadows Development Co. v. Mills,* 590 P.2d 1244 (1979), had before it a situation very similar to that now before us. The plaintiff, as here, had sought specific performance of a contract for the purchase of realty. The trial court, as here, dismissed the action, and the plaintiff, as here, appealed. Following the dismissal by the trial court, the defendant, as here, conveyed the property to a third-party purchaser. In an ultimate suit between the plaintiff and the purchaser, the defendants claimed that *lis pendens* had not survived the verdict in the trial court. The Utah Supreme Court did not agree.

First addressing the Lis Pendens issue, we note that *appellants simply urge that Lis Pendens has no effect or duration after judgment and pending appeal.* A review of *the basic doctrine of Lis Pendens,* our statutory enactment pertaining thereto, *and the prior pronouncements of this Court, fail to sustain their contentions.*

590 P.2d at 1247 (emphasis supplied).

The defendants there made the same argument that McBerry makes before us. The Supreme Court of Utah rejected it for the very reasons we have been discussing.

*Appellants* further *contend that since plaintiff failed to furnish a supersedeas bond it was not entitled to a stay of*

---

7. On the same day that the trial court denied McBerry's Motion to Terminate *Lis Pendens,* it granted Weston's Motion for Stay of Enforcement of Judgment, but subject to the filing of a surety bond in the amount of $1,620,720. No such bond was ever filed. In its motion, Weston argued that no bond was required because the trial court's judgment was not of the type to which Maryland Rules 8–422(a) or 8–423(a) applied. We fully agree with Weston's arguments, expressed in the first five paragraphs of its motion, as to why the trial court's judgment in this case was not covered by the Maryland Rules.

We do find it curious that Weston nonetheless felt it appropriate to ask for a Stay of Enforcement of Judgment. We would ask Weston, as we have asked McBerry, what precise act of enforcement it was seeking to stay and whether such an act was truly an act of "enforcement." We can only attribute what we believe to have been an irrelevant motion to an excess of caution.

> *proceedings and that such failure in some way rendered the notice given by the recorded lis pendens ineffectual.* . . . *[P]laintiff was not bound to furnish supersedeas.* Such was merely available to him. *The fact that none was furnished is of no consequence* in this case. This is found to be so when it is observed that *the purpose and effect of supersedeas is to restrain the successful party and the lower court from taking affirmative action to enforce a judgment or decree. The judgment involved here was one of dismissal and, as such, was self-executing. Hence, it was not the subject of any enforcement and the failure to perfect supersedeas could in no way affect it.*

590 P.2d at 1248 (emphasis supplied).

The case of *Gumberts v. East Oak Street Hotel Co.*, 404 Ill. 386, 88 N.E.2d 883 (1949), is also very much on point. The trial court there dismissed the plaintiff's action, and the plaintiff appealed. The Supreme Court of Illinois pointed out that a supersedeas bond operates only against an affirmative court-ordered enforcement of a judgment and not against a self-executing dismissal of a suit.

> [A] supersedeas operating only against the enforcement of a judgment and not against the judgment itself, the rule is that *a self-executing judgment is not affected by a supersedeas.*

88 N.E.2d at 885 (emphasis supplied).

The defendant, which was the beneficiary of the dismissal of the complaint, had incidentally also been awarded court costs. The Supreme Court distinguished the affirmative award of costs, which could be stayed by a supersedeas bond, from the dismissal of the action, which was self-executing and not subject to being stayed.

Applying the foregoing principles to the present case, it is apparent that *the decree* in the Stein case *dismissing the complaint* for the want of equity *was self-executing,* except in so far as the cause was dismissed at plaintiff's costs. The supersedeas, when it became effective, operated only against the enforcement of the decree and not against the

decree itself. *The decree itself dismissed the complaint and thus required no enforcement. There were no further proceedings to be stayed by the supersedeas and no process was necessary,* except, possibly, an execution against Stein and the other plaintiffs for the costs of the action.... The only purpose performed by the supersedeas was to stay the enforcement of so much of the decree as allowed the defendant corporation and its officers their costs in the trial court.

*Being self-executing, the decree in the Stein case was unaffected by the supersedeas.*

*Id.* (emphasis supplied).

In *Martin v. Abbott,* 72 Neb. 89, 100 N.W. 142 (1904), the plaintiff 1) sued to recover dower in certain real estate, 2) lost the suit at the trial level, and 3) appealed to the Supreme Court of Nebraska, which reversed the decision of the trial court. While the appeal was pending, the property was sold. The purchaser attempted to fend off the adverse effect of either *lis pendens* or actual notice by pointing out that the plaintiff had not, for the pendency of the appeal, obtained a supersedeas bond. The plaintiff, on the other hand, maintained that because the relief she sought had been denied by the trial court, no supersedeas bond for the appeal was required or, indeed, even provided for.

Love insists that the judgment of the district court ... was a final judgment upon which he had a right to rely; that no supersedeas bond having been executed by her, any subsequent proceedings in the Supreme Court by which the decree might be reversed, modified, or vacated could not interfere with the rights which he had obtained by reason of his purchase, while the decree was in full force. On the other hand, Mrs. Martin takes the position that no supersedeas bond was required or provided for by the statute, that it was unnecessary for her to give such a bond, and that consequently a purchaser from Abbott with actual notice of the pendency of her appeal was in no better position than Abbott himself, and took the title subject to all the contin-

gencies which might befall him as to the vacation, modification, or reversal of the decree.

100 N.W. at 142.

The Supreme Court of Nebraska agreed with the plaintiff that the statute did not even provide for a supersedeas bond in such a case.

> The statute makes no provision for a supersedeas bond in a case like the one at bar. And therefore we think the failure to file such a bond is no protection to one who purchases the property from a litigant with actual notice of the pendency of the suit in which the title thereto is in question.

100 N.W. at 143 (emphasis supplied).

### Comparing Apples and Oranges

In a last gasp, McBerry invokes three decisions by this Court as ostensible authority for the proposition that Weston's failure to obtain a supersedeas bond "did not stay the effect of the Trial Court's judgment."

> The Maryland Court of Special Appeals, in at least three cases involving a Trial Court's Order affecting the disposition of real property, has ruled that the failure of the appealing party to file a supersedeas bond did not stay the effect of the Trial Court's judgment and that the intervening sale during the appeal process made the appeal moot. Creative Development Corp. v. Bond, 34 Md.App. 279, 367 A.2d 566 (1976); Washington Homes, Inc. v. Baggett, 23 Md.App. 167, 326 A.2d 206 (1974); Onderdonk v. Onderdonk, 21 Md.App. 621, 320 A.2d 585 (1974).

(Emphasis supplied).

The trial court's judgment, of course, was not an order that McBerry sell the property. It was simply a denial of Weston's suit for specific performance. To enjoy its victory, McBerry did not need to do anything. To compare enforceable judgments in favor of a plaintiff, ordering the sale of land, with judgments in favor of a defendant, which simply leave the status quo undisturbed, is to compare apples with oranges.

■ The cases cited by McBerry have no applicability. They do not establish plenary protection for third-party purchasers of property during the pendency of an appeal from the possible adverse effect of the appeal. They represent a very special circumstance that is just not present in this case. In those cases in which **the lower court has ordered a judicial sale** of the property, the purchaser at such a sale is protected from *lis pendens* and from the adverse effect of the appeal unless the appellant has obtained a stay of enforcement of the court-ordered disposition. This is a special circumstance that will, in effect, trump *lis pendens*.

■ The cases do not hold that this set of circumstances will operate to terminate *lis pendens*. The question of *lis pendens* notice is immaterial. The law declares, as a matter of overriding policy, that a purchaser at a judicial sale will be deemed to be a *bona fide* purchaser regardless of whether he had notice of an appellate challenge or not. It is a deliberate policy decision that was explained by Judge Digges in *Leisure Campground & Country Club v. Leisure Estates*, 280 Md. 220, 223, 372 A.2d 595 (1977):

> The general rule is that *the right of a purchaser* to receive property acquired *at a judicial sale cannot be affected* by the reversal of an order ratifying the sale where a bond has not been filed, *even though the purchaser may know that a claim is being asserted* against ratification. *The policy underlying this rule is to encourage nonparty individuals to bid at such sales.*

(Emphasis supplied).

All of the cases cited by McBerry deal with such judicial sales. Such court-ordered actions are grist for the mill of Maryland Rules 8–422 through 8–424 because they are modalities for enforcing judgments. In *Creative Development Corp. v. Bond*, 34 Md.App. at 281, 367 A.2d 566, there was a foreclosure sale and the trial judge passed a decree commanding "that the property subject to the Deed of Trust ... be sold." In *Washington Homes v. Baggett*, the trial court decreed the specific performance of building contracts. 23

Md.App. at 169–70, 326 A.2d 206. In *Onderdonk v. Onderdonk*, the trial court appointed trustees to sell the property. 21 Md.App. at 623–24, 320 A.2d 585 ("[I]t is well established that the rights of a bona fide purchaser of property *through a judicial sale* cannot be affected by a reversal on appeal of the order ratifying the sale in the absence of the filing of a supersedeas bond.") (Emphasis supplied). The *Onderdonk* opinion went on:

> Since ratification of the sale by the chancellor could not be stayed in the absence of the filing of a supersedeas bond by the appellants, the trustees were not only within their rights but were obligated to convey the property to the bona fide purchaser.

21 Md.App. at 624, 320 A.2d 585. ·

In turn, every one of the cases relied on by those three cases also deals exclusively with the favored status of **a purchaser at a judicial sale.** See, *e.g., Cook v. Boehl,* 188 Md. 581, 592, 53 A.2d 555 (1947) ("Thus an appeal from *a decree of a court* of equity *directing the sale* of property does not stay the proceedings unless an appeal bond is filed or a stay is procured from the lower court.") (Emphasis supplied); *Sawyer v. Novak,* 206 Md. 80, 88, 110 A.2d 517 (1955) ("[T]he rights of a *bona fide* purchaser of mortgaged property would not be affected by a reversal of the order of ratification, unless a bond is given to stay proceedings."); *Parker v. Columbia Bank,* 91 Md.App. 346, 374, 604 A.2d 521 (1992) ("The right of a purchaser to receive *property acquired at judicial sale* cannot be affected by the reversal of an order ratifying the sale where a bond has not been filed.") (Emphasis supplied).

Although we need go no further, we cite two out-of-state cases because they so forcefully articulate the categorical difference between 1) purchasers at judicial sales, who enjoy favored status, and 2) purchasers from litigants, who remain subject to *lis pendens*. In *Kremer v. Schutz,* 107 P. at 781, the Supreme Court of Kansas noted the critical contrast in status:

*Schutz was not in the attitude of one purchasing at a judicial sale.* Such a purchaser may acquire a good title notwithstanding a subsequent reversal of the judgment under which the sale was made. *These provisions,* however, *afford no protection to one who purchases or leases from a party to the litigation.*

(Emphasis supplied).

In *Di Nola v. Allison,* 143 Cal. 106, 114–15, 76 P. 976, 979 (1904), the Supreme Court of California similarly noted the difference between categories of purchasers.

*Neither is the plaintiff herein in a position to invoke any protection* under the provisions of section 957 of the Code of Civil Procedure. By the terms of that section, the court is authorized to make restitution "so far as such restitution is consistent with protection of a purchaser ... at a sale ordered by the judgment, or had under process issued upon the judgment." *The plaintiff herein did not purchase the property "at a sale ordered by the judgment," and the principles under which protection is given to strangers who purchase at judicial sales have no application.*

(Emphasis supplied).

The judicial sale cases are in a special category of their own and have nothing to do with this case. The purchase of the 46 lots by Maryland Homes, PF on October 7, 2005 was not made at a judicial sale or pursuant to any other order or decree by the trial court. It was a purchase from a litigant and enjoys no special protection.

We hold that throughout the pendency of this appeal *lis pendens* has continued with unabated force. The purchaser of October 7, 2005, is vulnerable to any possible adverse decision flowing from this appeal. The appeal, therefore, is not moot.

## II. The Appeal Proper

Weston is a Maryland corporation engaged in building and developing residential homes. McBerry is a limited liability company engaged in the business of developing real estate. The contract between Weston and McBerry for the purchase

of the 46 lots, on a tract of a little over 12 acres, was signed on March 7, 2002. The purchase price was to be $2,460,000. Weston's Amended Complaint demanding specific performance of the contract was filed on May 25, 2004. At the close of McBerry's case on January 26, 2005, McBerry moved for judgment, pursuant to Maryland Rule 2–519, on the ground of accord and satisfaction. On February 2, the trial court rendered its oral opinion, granting McBerry's motion. The court issued its Order for judgment in favor of McBerry on February 8.

Weston's appeal from that judgment raises two related contentions:

1. The conclusion of the court below that specific performance was barred by accord and satisfaction is erroneous because there was neither offer nor acceptance of a compromise and settlement, but, on the contrary, both parties continued to assert their claims to the fullest extent, undiminished by even the slightest concession as an inducement to settlement.

. . . .

2. Even if there had been an offer to settle and acceptance, any "settlement" would be ineffective for want of consideration.

### Accord and Satisfaction, Generally

In *Jacobs v. Atlantco Limited Partnership*, 36 Md.App. 335, 340–41, 373 A.2d 1255 (1977), this Court quoted with approval 1 C.J.S., *Accord and Satisfaction*, § 1 (1936 & Supp. 1976), characterizing the passage quoted as "a clear capsule definition" of accord and satisfaction.

Accord and satisfaction is a method of discharging a contract or cause of action, whereby *the parties agree* to give and accept something in settlement of the claim or demand of the one against the other, *and perform such agreement, the 'accord' being the agreement, and the 'satisfaction' its execution or performance.*

(Emphasis supplied). And see *Automobile Trade Assoc. v. Harold Folk Enterprises,* 301 Md. 642, 665, 484 A.2d 612 (1984); *Wickman v. Kane,* 136 Md.App. 554, 561, 766 A.2d 241, *cert. denied,* 364 Md. 462, 773 A.2d 514 (2001); *Kimmel v. Safeco Insurance Co.,* 116 Md.App. 346, 361, 696 A.2d 482 (1997); *Barry Properties v. Blanton & McCleary,* 71 Md.App. 280, 286, 525 A.2d 248 (1987); *Air Power, Inc. v. Omega Equipment Corp.,* 54 Md.App. 534, 538, 459 A.2d 1120 (1983), all of which opinions adopt that same definition as Maryland law.

Although the phrase "accord and satisfaction," as a linguistic unit, falls trippingly from the tongue, it is important to remember that it is composed of two distinct elements. It is particularly important for us to remember because in this case our focus will be more on the accord than on the satisfaction. In *Jacobs v. Atlantco,* 36 Md.App. at 340, 373 A.2d 1255, Judge Powers, referring to the case as "a textbook illustration of the law of accord and satisfaction," also quoted with approval from 1 Am. Jur. 2d, *Accord and Satisfaction,* § 1 (1962 & Supp. 1976):

> *With respect to the terms separately, an accord is an agreement by one party to give or perform and by the other party to accept,* in settlement or satisfaction of an existing or matured claim, *something other than that which is claimed to be due,* and the satisfaction is the execution or performance of the agreement, or the actual giving and taking of some agreed thing. *The accord is the agreement* and the satisfaction is the execution or performance of such agreement. When an accord is followed by a satisfaction, it is a bar to the assertion of the original claim, but until so followed, it has no effect.

(Emphasis supplied).

In *Wickman v. Kane,* 136 Md.App. 554, 561, 766 A.2d 241, *cert. denied,* 364 Md. 462, 773 A.2d 514 (2001), Judge Deborah Eyler did not simply list the constituent elements of an accord an satisfaction, but also pointed out that accord and satisfaction is an affirmative defense and that, accordingly, the burden of proof is on the party asserting the defense.

*Accord and satisfaction is an affirmative defense.* To prevail, *the defendant must prove:* 1) that a dispute arose between the parties about the existence or extent of liability; 2) that, after the dispute arose, *the parties entered into an agreement to compromise and settle the dispute* by *the payment by one party of a sum greater than that which he admits he owes* and *the acceptance by the other party of a sum less than that which he claims is due;* and 3) that the parties performed that agreement.

(Emphasis supplied).

### An Accord and Satisfaction Is Contractual in Nature

 Although an accord and satisfaction is not a substitute contract or novation, in that it requires not simply a new promise but also the performance of that promise, it is nonetheless contractual in nature. The contractual nature of accord and satisfaction will assist us in determining in a given case whether the various required elements have been adequately established. 1 C.J.S. *Accord and Satisfaction* § 6 (2005) addresses the contractual nature of the subject.

*An accord and satisfaction is,* generally, *contractual in nature. An accord is in essence a contract or agreement,* therefore, and accord and satisfaction is itself a contract which is founded and dependent on, and results from, a contract, express or implied, between the parties.

*The doctrine of accord and satisfaction is grounded on basic contractual principles,* therefore, and the concept thereof is based on the law of contracts. Accordingly, *whether a given transaction amounts to an accord and satisfaction is governed by the laws or rules of contracts,* and once it is established that there is a valid accord and satisfaction it is governed by the same rules as apply to other contracts.

(Emphasis supplied).

1 Am. Jur. 2d, *Accord and Satisfaction,* § 4 (2005) is in complete agreement about the essential character of accord and satisfaction.

*An accord is contractual in nature.* In fact, an accord and satisfaction is a new contract—a contract complete in itself, and as long as the basic requirements to form a contract are present, there is no reason to treat such agreement differently from other contracts which are binding.

Generally, a valid accord and satisfaction requires four elements.

(1) proper subject matter;

(2) competent parties;

(3) a meeting of the minds of the parties; and

(4) consideration.

It has also been held that for there to be an accord and satisfaction, *the contract elements of offer, acceptance, and consideration must all be present.* Stated more simply, the essential elements of "accord and satisfaction" are an agreement to settle a dispute and consideration which supports the agreement.

(Emphasis supplied).

We also find helpful the definition provided by 2 *Restatement of Contracts Second* (1981), § 281(1):

*An accord is a contract under which an obligee promises to accept a stated performance in satisfaction of the obligor's existing duty.* Performance of the accord discharges the original duty.

(Emphasis supplied).

The Court of Appeals, in *Automobile Trade Assoc. v. Harold Folk Enterprises,* 301 Md. 642, 666, 484 A.2d 612 (1984), fully agreed as to the "essentially contractual" nature of accord and satisfaction.

*An accord and satisfaction is essentially contractual,* consideration for which can take monetary or non-monetary forms.

(Emphasis supplied). See also *Kimmel v. Safeco,* 116 Md. App. at 362, 696 A.2d 482.

In *Wickman v. Kane, supra,* Judge Eyler emphasized the necessity of a meeting of the minds as she pointed out that one of the elements to be proved is that "the parties entered into an agreement to compromise and settle the dispute." 136 Md.App. at 561, 766 A.2d 241. She also explained the *quid pro quo* nature of the agreement by pointing out that there must be both 1) "the payment by one party of a sum greater than that which he admits he owes" and 2) "the acceptance by the other party of a sum less than that which he claims is due." *Id.*

## The Settlement That Never Was

 When the Contract was signed on March 7, 2002, the 46 lots were still raw land. The Contract included what the parties have referred to as a "takedown schedule," providing for the incremental purchase of the lots. Pursuant to Paragraph 3 of the Contract, the first five lots were to be settled on "within ten (10) days following recordation" of the plats of subdivision for the Project. Only that first installment of five lots is pertinent to this appeal.

The initial plat for the subdivision was not recorded until April 23, 2003. McBerry did not send Weston any formal notice that the plat had been recorded or that the time for settlement on the first five lots had been triggered. The president of Weston, George W. Stone, Jr., testified that he learned of the recordation on May 21, 2003.[8]

Stone spoke by telephone on May 29 with Larry L. Wooster, the managing member and, along with his wife, the owner of McBerry, about arranging settlement on the first five lots.

---

8. The trial judge accepted May 21 as the date by which Weston was aware of the recordation.

 [T]he plat book and folio number that it was actually approved on or recorded on April the 13th, 2003. Now, getting it actually recorded doesn't mean you get it back from the Clerk that day. In fact, normally they have to take it to get it photocopied and do other kinds of things. But *in any event as of at least May the 21st, Weston was aware that the plat had been recorded.*

 (Emphasis supplied).

Wooster informed Stone, however, that McBerry was not ready to settle. Stone testified:

*What he said was he wasn't ready to settle* because there wasn't a tree knocked down at this point, or they were just beginning to knock the trees down and he didn't want us to get in the way. If we were to put two or three model homes and to start building spec houses he would not have a place to knock the trees down nor have a place to stockpile them so he could haul them out, haul the debris out.

(Emphasis supplied).

The trial judge's understanding of the Contract was that McBerry was to deliver to Weston finished lots, so that Weston could then begin to build, on the first group of lots at least, a group of model homes.

*McBerry was to finish and deliver finished lots,* which I draw the inference [that] what that means is [that] *you have your roads in, your gutter[s],* you constructed *your storm water management and have the water and sewer to lot line* so all Weston would have to do is build the house and connect the utilities.

(Emphasis supplied).

According to Stone, Wooster told him that he would contact him about an appropriate settlement date.

He told me he *would let me know when he felt the job was far enough along and would give me a call.* We were in contact fairly often.

(Emphasis supplied).

Even though no settlement on the first five lots was effected within ten days of the plat's recordation (whether measured from April 13 or May 21), both Weston and McBerry continued to work in close cooperation with each other in developing the property. The trial judge made the following findings of fact.

On June 6th, 2003, a Weston employee obtained street addresses for the lots from the Charles County Department of Emergency Services and sent them to McBerry.

An employee of Weston prepared applications for water and sewer service for the individual lots which Mr. Wooster signed on behalf of McBerry on June the 23rd, 2003.

On July the 7th, 2003, a Weston employee sent information to Washington Gas concerning the service loads that would be necessary to provide that utility to the houses.

On July the 23rd, 2003, a Weston employee sent Wooster a marked up copy of the Home Owner's Association documents. Previously Mr. McBerry's attorney had done the first draft. They were sent to Weston and Weston sent them to their attorney who suggested certain changes and they were sent back.

In June of 2003, McBerry ran into a major problem with the Army Corps of Engineers over the subject of wetlands, and the entire project shut down until that problem was resolved approximately six months later. Stone recounted the substance of a telephone call he received from Wooster on that occasion.

On June 20th in '03, *he called me about a wetland problem* and he was very upset at this time saying, Wes, I don't know what I am going to do, the job is going to be shut down. It wasn't shut down at that time. Some woman in the back was complaining about wetlands. *He said, I'll give you all your money back, I'll give you everything you want back.*

(Emphasis supplied).

With respect to the Army Corps of Engineers, the findings (and the editorial comment) of the trial judge, in his oral opinion of February 2, 2005, are enlightening.

Work progressed on the subdivision, however, *a major setback occurred with the dreaded Army Corps of Engineers.* And *having done some real estate practice it is the dreaded Corps of Engineers.* I think there was one notation in the log that *the project was stopped because of about 600 square feet of alleged wetlands.*

Am I correct on that? It was some document I remember reading that and I thought that 8 years ago they passed

if the wetlands was under so many square feet they wouldn't get involved. That is what I recall.

*Anyway they got involved. Maryland Department of Environment got involved and hit them with a stop work order* and *the final approval by the Corps wasn't forthcoming until December the 15th, 2003.*

Now, Mr. Wooster in his testimony mentioned this was the first time as an individual he had attempted land development and after his trials and tribulations on this one I don't know if he will do it again. But anyway *once he did get the approval, of course, you have wet weather in the winter,* which he testified to, *some of the subs wouldn't come back when he wanted them to so things kind of dragged on a little bit beyond what everyone expected.* (Emphasis supplied).

The trial judge elaborated on the difficulty that McBerry had experienced in getting the project started up again even after approval by the Corps of Engineers.

[S]oon after the Corps of Engineer's final approval McBerry restarted the work as I mentioned excavation and grading, installation of the sewer and water mains but *he was somewhat slowed down by the inability to keep his subs on the site as well as the weather.* And as of the date of trial I think it was his opinion that he had completed 65 to 70 percent of the infrastructure.

(Emphasis supplied).

Stone testified that in February of 2004 he again approached Wooster about a settlement date, and that Wooster continued to put him off.

[MR. STONE]: I talked to Larry several times in February about settlement.

MR. DARROW: What did he say?

. . . .

[MR. STONE]: *He still hadn't done a thing since June before he got shut down. The piles of trees were still there and he just couldn't get anything moving. He would call me as soon as* he got in touch with, not his excavating crew,

but his pipe crew, and as soon as *he resolved that issue, he would call me and we would set settlement up.* I would still be in the way at this time.

(Emphasis supplied).

With respect to ongoing communication between the parties, McBerry asserts in its brief that the "trial court expressly rejected Weston's testimony that there had been telephone discussions about tendering settlement of the initial five lots prior to May 2004." That is not exactly an accurate statement. The judge did not reject the testimony that there had been some telephone contact between Stone and Wooster in which Stone attempted to arrange a settlement. What he rejected, as an apparent exaggeration, was Stone's reference to "10 to 20 times."

Additionally, *Mr. Stone testified that he had asked Wooster 10 to 20 times about tendering settlement and I reject that testimony.* I think it is very clear that most of the conversations between Weston and McBerry were with Mr. Wooster on one side and Amy Bonsal and Kelly Cashen on the other side.

*[There] might have had one or two cell phone calls but he didn't ask 10 or 20 times.*

(Emphasis supplied).

The judge himself made reference to one such call in April of 2003.

*In late April there was a telephone call between Mr. Stone and Mr. Wooster wherein Stone stated that Weston wanted to "go to settlement."* Wooster, as he testified, detected that there was a little chuckle in Stone's voice because he said, "you know, I looked at that contract and two years had gone by and they had not bought any lots and additionally they hadn't bought the first five lots." Wooster said they are trying to put me on and told Stone there is something we have to discuss.

(Emphasis supplied).

The trial judge found, moreover, that throughout the Spring of 2004, Weston and McBerry continued to work together in close cooperation.

Now, *during the first four months of 2004 Weston employees,* and it was basically Ms. Cashen and also Amy Bonsal *had several conversations with Wooster concerning progress on the subdivision.* Additionally *they were working on county approval concerning various site plan approvals for the houses* and you can see in *Defendant's Exhibit 5 details the progress they were making at that time.*

(Emphasis supplied).

In any event, no settlement date for the first five lots was ever arranged. At no time had McBerry ever requested Weston to go forward with settlement. A meeting was arranged to take place in Wooster's attorney's office on May 4. Rather than discussing a settlement date, however, Wooster and his attorney took the position that the original contract had expired and that Weston would be given "the first opportunity to step up to the plate" and to negotiate a new contract based on the increased value of the land. Wooster himself testified.

We went to the May 4th meeting offering them an opportunity, *we felt that the contract had expired, and we offered them an opportunity to* negotiate, *renegotiate the contract,* and that was, in fact, that was the basis of the prior conversation with Wes, because he called and asked me, and I said, Wes, *I know what is going on* and I wouldn't, you know, I wouldn't cheat you, *this would certainly give you the first opportunity to step up to the plate here.* We feel the contract has expired.

(Emphasis supplied).

Weston's attorney, Dennis Hoover, Esq., gave his impression of the meeting.

Larry [Wooster] started to describe the costs, the overruns, if you will, or the additional expenses that he had in the development process, and from there it went to a discussion of, *they basically wanted additional money for the purchase price.*

Q. Did they say, indicate anything to you with respect to a timeframe of settlement?

A. The discussions evolved to such a point where *they gave us a number that they thought the lots were worth,* so *why would we pay that price,* and *they said,* well, *because you haven't closed yet,* and at that point *I said, you told us you didn't want to close yet.*

Q. And what was Mr. Wooster's response to that?

A. He lowered his head and looked down at the table.

(Emphasis supplied).

Hoover went on:

MR. DARROW: Well, *did anybody say anything in response to your statement, we have an arrangement regarding settlement.* Did anybody dispute that?

THE WITNESS: *No.*

MR. FITZGERALD: Objection. Move to strike.

BY MR. DARROW:

Q. Let me try it this way. *Did anybody respond in any way to that?*

A. *No.*

(Emphasis supplied).

In the wake of the May 4 meeting, the relationship between Weston and McBerry, which apparently had theretofore been amicable, deteriorated badly. Communication between the parties was thereafter made only through their attorneys. Over the course of the next two weeks, a flurry of combative correspondence flew back and forth.

Weston sent a written notice to McBerry on May 10 that it was scheduling the settlement. On May 11, Weston filed its suit for specific performance, along with several other counts. McBerry's counsel notified Weston's counsel that it was not willing to go to settlement. On May 13, McBerry's counsel formally notified Weston that McBerry was electing to terminate the Contract as a result of Weston's default in not making timely settlement on the first five lots. The May 13 letter declared that "neither party shall have any further

rights or obligations under this Contract, and the Contract shall be of no further force or effect at law or in equity."

On May 17, Weston's counsel replied to McBerry that Weston remained ready, willing, and able to go to settlement on the first five lots and would reschedule the closing unless McBerry confirmed in writing that it was unwilling to close. McBerry's counsel responded on May 18 that McBerry's position was that the Contract had been terminated due to Weston's default. The letter further indicated, however, that McBerry would be glad to negotiate a new contract at a new selling price.

On May 25, Weston filed its Amended Complaint seeking, *inter alia,* specific performance of the March 7, 2002 Contract. At the trial on that Amended Complaint, the court granted judgment in favor of McBerry on the ground of accord and satisfaction.

## The Unspoken Reason Why

Standing in the shadows of the negotiation was a specter that dominated every thought but whose presence polite conversation seems reluctant to acknowledge. For a number of reasons that appear to have been the fault of neither party, including prominently the problem with the Army Corps of Engineers, the project had run well behind its initially anticipated schedule. Meanwhile, in the two-year interim between March 7, 2002, and May 4, 2004, Charles County experienced a real estate boom. The trial judge, after mentioning how McBerry had subtly alluded to the sensitive subject at the May 4 meeting, graphically described how real estate prices had gone "through the roof."

> *Wooster* mentioned that he had incurred unexpected additional costs and *was kind of seeking an increase in the lot price* because he felt he didn't have a contract and also he had these extra costs.
>
> Now, I think everyone will agree that *between the time of the signing of the contract and the date of that meeting real*

*estate prices in Charles County went through the roof.* Am I correct, gentlemen?

MR. FITZGERALD: Yes sir.

THE COURT: Mr. Snow.

MR. SNOW: I believe that is the contention.

THE COURT: They were unexpectedly high, let me put it that way. For instance a 3 acre lot on a former farm in Hughesville I was told in a different case in testimony *they are going for $200,000. 10 years ago you would be lucky if you got $40,000 for it.* So anyway *there was an unexpected price rise in real estate and obviously each side wanted to maximize their end of the deal as far as profit went.*

(Emphasis supplied).

The judge had a sensitive finger on the pulse of the case when he observed that McBerry "was kind of seeking an increase in the lot price." McBerry at that meeting was still speaking the language of the "takedown schedule" but was really talking about the selling price. Weston, equally well schooled in the conventions of the scorpion dance, confined its responses to the language of the "takedown schedule."

Whether it has any bearing on the ultimate outcome of the case or not, it is nonetheless clear that it was to the decided advantage of Weston to keep the Contract intact. It is equally clear that it was to the decided advantage of McBerry to get out from under the Contract and to negotiate a new contract with a higher selling price.

### A Curious Paradox

McBerry's position, that it was entitled to terminate and had, indeed, terminated the Contract, was first communicated to Weston on May 13, 2004, by a letter from McBerry's lawyer to Stone, which stated in pertinent part:

*This letter will serve as notice,* in accordance with Section 21 of the Contract, *of the Seller's election to terminate the Contract as a result of your default* thereunder. In accordance with Section 21 of the Contract, *your earnest money deposit is forfeited to the Seller as damages for your default*

under the Contract. *Any sums that you have voluntarily advanced outside of the Contract with respect to the property, such as sewer tap fees, will be returned to you by the Seller* under separate cover.

From and after the date of this notice, neither party shall have any further rights or obligations under the Contract, and the contract shall be of no further force or effect at law or in equity.

(Emphasis supplied).

Section 21 of the Contract provided, in pertinent part:

21. DEFAULT.

*Failure* on the part of the Purchaser *to comply with the terms, covenants, and conditions of this Contract shall constitute a default* entitling the Seller to retain all deposit monies held hereunder by Seller at the time of such default and to terminate this Contract, by written notice to Purchaser, and to pursue such other rights and remedies as may be available at law or in equity (the deposit monies retained being a fund to apply to Seller's damages).

(Emphasis supplied).

Weston's position, reflected in a letter of May 17 from its lawyer to McBerry's lawyer, was that "the terms, covenants, and conditions" referred to by § 21 and pertinent to this case would have been § 3a of the Contract, which provided 1)for notice of default in complying with the "takedown schedule" and 2) for a 10–day grace period within which to cure that default. The final portion of § 3a reads:

*If Purchaser shall,* at any time, *default in buying Lots to comply with the foregoing minimum takedown schedule,* then, in addition to all other rights and remedies of Seller, *Seller shall have the right upon written notice to Purchaser, and a period of ten (10) days in which Purchaser may buy the number of Lots required to bring Purchaser in compliance with the takedown schedule,* sell any or all remaining

Lots to third parties, free of any claim of Purchaser, and free of the lien, operation and effect of this Contract. (Emphasis supplied).

Weston's letter of May 17 to McBerry, in pertinent part, explains:

[Y]our letter is quite confusing as it fails to define or identify the nature of Purchaser's alleged default. *Since your client has refused to close, my client is not in default under any conceivable manner of the Contract.* However, if the alleged default is for Purchaser's failure to close in accordance with the Contract's settlement schedule, *Section 3.a. of the Contract provides the Purchaser with a period of ten (10) days from date of notice of default to cure such default.* Therefore, unless you *specifically advise in writing* that your client is unwilling to close, we must reschedule closing on the first five (5) lots for 2:00 p.m. on Thursday, May 20, 2004 at your office in accordance with the terms of the Contract.

(Emphasis supplied).

McBerry responded within 24 hours, through the May 18 letter of its lawyer to Weston's lawyer, eschewing the "cure" provision of § 3a of the Contract and finding ostensible solace in the fact that § 21 *per se* has no such provision. The May 18 letter states:

*The Seller exercised its right to terminate the Contract as a result of your client's failure to settle on the first five (5) lots in accordance with the requirements of Section 3.a.(i) of the Contract.* We note that the Seller's remedy in Section 3.a. of the Contract is "in addition to all other rights and remedies of Seller", and therefore is not an exclusive remedy. Rather than pursue that remedy, *the Seller has simply exercised its right to terminate the Contract as a result of the Purchaser's default as permitted in Section 21 of the Contract.* We further note that *Section 21 does not provide the Purchaser with a cure period.*

(Emphasis supplied).

Within 24 hours, Weston's counsel wrote back with a May 19 letter to McBerry's counsel, maintaining that § 21 of the

Contract cannot be read without reference to § 3a. That letter stated:

Your reliance upon Section 21 of the Contract for a right to declare a default is without any merit. *The general provisions of Section 21 cannot on any reasonable basis be interpreted to defeat the specific provisions of Section 3(a),* which provides the specific terms for the purchase and settlement of the Lots. Section 3(a) clearly includes the purchase of the first five (5) Lots as part of the takedown schedule.

Moreover, *Section 3(a)* further *provides that your client* has no right to sell any of the Lots to any third party, and *cannot be free of Purchaser's claim* or the lien created by the Contract, *without first having given the required written notice to Purchaser, and "a period of ten (10) days in which Purchaser [retains the right to] buy the number of Lots required to bring Purchaser in compliance with the takedown schedule."*

*The inclusion of this language in Section 3(a) establishes that the ten (10) day notice provision* during which Purchaser "may buy" the number of Lots required to bring itself into compliance with the takedown schedule *is a right vested in the Purchaser, which Seller cannot unilaterally elect to cancel as a remedy.* That is, the *Seller's right is triggered only "upon written notice to Purchaser" and the ten day cure period. There is no dispute that your client never issued any such written notice to our client,* and in fact, acted to the contrary.

(Emphasis supplied).

The curious feature of all of this sound and fury about the "takedown schedule" is that it is a shadow war on a surrogate issue. Although McBerry invokes § 3a's mantra about "time being of the essence," it nowhere suggests how the timing of the first installment of the "takedown schedule" actually was of the essence in this case. Had Weston done more quickly the very thing that McBerry protests Weston did not do quickly enough, McBerry would have been locked into a

selling price it was assiduously scrambling to avoid. How does McBerry rue not having gotten more quickly that which, in hindsight, it did not want at all? A settlement on the first five lots was, from McBerry's point of view, a consummation devoutly to be dreaded.

McBerry's suddenly reawakened interest in the "takedown schedule" smacks of being an opportunistic afterthought. Being thus opportunistic is not, of course, *ipso facto* bad, certainly not in the world of business and commerce, but it does raise an eyebrow as to the depth of McBerry's chagrin over the delay in settlement.

### Two Ostensible Tenders; And Then There Was One

In its effort to prove accord and satisfaction, McBerry relies on two checks 1) that it sent to Weston while Weston's suit was pending and 2) that Weston in one manner or another retained.

The first check, in the amount of $143,382.00, was sent by McBerry's counsel to Weston's counsel on June 10, 2004, and was negotiated by Weston. The second check, in the amount of $50,000.00, was sent by McBerry's counsel to Weston's counsel on August 6, 2004, and was placed in the escrow account of Weston's attorneys pending the final resolution of the case. To reduce somewhat the clutter of issues before us, we can readily eliminate from any further consideration the first check of June 10, 2004.

The background is that § 6 of the Contract had provided that McBerry was to be responsible for making "the initial deposit and/or payment of any sewer tap fee and/or impact fee necessary to obtain approval and recordation of a final plat of subdivision for the Lots." In April of 2003, however, McBerry informed Weston that it did not have the money to pay the required fees and requested Weston to advance the money on behalf of McBerry. By two checks of 1) $57,352.80 and 2) $86,029.20, for a total of $143,382.00, Weston advanced the money and the fees were paid.

█ The check for $143,382.00 to Weston, delivered on June 10, 2004, contained the single notation "Water & Sewer Fees Refund." The accompanying letter from McBerry's counsel to Weston's counsel described that "Refund" as follows:

> In accordance with our prior letter terminating the subject contract, we have enclosed check number 1094 of McBerry, LLC, made payable to Weston Builders & Developers Inc., in the amount of $143,382.00. *This check represents a return to Weston Builders of the sewer tap fees paid for the McBerry Subdivision voluntarily by Weston Builders outside of the subject contract.*

(Emphasis supplied).

The only earlier reference to those funds advanced by Weston on behalf of McBerry had been in the letter of May 13, 2004, from McBerry's counsel to George Stone, in which McBerry anticipated making the refund.

> *Any sums that you have voluntarily advanced outside of the Contract* with respect to the property, *such as sewer tap fees, will be returned to you* by the Seller under separate cover.

(Emphasis supplied).

The check itself refers only to the money as a "Water and Sewer Fees Refund." Both the accompanying letter of June 10 and the earlier letter of May 13 speak of a "return" of funds "voluntarily advanced outside of the Contract." This check of June 10 does not even get close enough to the ballpark of an offer of settlement to justify further analysis. We shall, therefore, confine any further analysis to the August 6, 2004, check for $50,000.00.

### The Necessary Quality of an Accord

█ As we take up the analysis of the August 6 check from McBerry to Weston in the amount of $50,000.00, it is appropriate to focus in on the necessary quality of an effective offer of settlement. Maryland Code, Commercial Law Article, § 3–311 deals specifically with "Accord and satisfaction by use

of instrument." Subsection (a) lists the necessary elements of an accord and satisfaction.

> If a person against whom a claim is asserted proves that (i) *that person in good faith tendered an instrument to the claimant as full satisfaction of the claim,* (ii) *the amount of the claim was unliquidated or subject to a bona fide dispute,*[9] and (iii) the claimant obtained payment of the instrument, the following subsections apply.

(Emphasis supplied).

It is subsection (b) on which we center our attention in this case.

---

**9.** Lest anyone misread and misapply what we say in the following discussion about the necessary quality of an accord, let it be carefully noted that the context of the entire discussion is one in which subsection 3–311(a)(ii) has first been satisfied:

(ii) the amount of the claim was unliquidated or subject to a bona fide dispute.

The law of Accord and Satisfaction makes a critical distinction between 1) the adequacy of certain offers to settle unliquidated claims and 2) the inadequacy of those very same offers to settle liquidated claims. In *Eastover Co., Inc. v. All Metal Fabricators, Inc.,* 221 Md. 428, 433, 158 A.2d 89 (1960), the Court of Appeals, through Chief Judge Brune, addressed the criterion of liquidation.

1 Williston, *Contracts* (3rd ed.) § 128 defines an unliquidated claim as "one, the amount of which has not been fixed by agreement or cannot be exactly determined by the application of rules of arithmetic or of law." Cf. *Blick v. Mercantile Trust & Deposit Co.,* 113 Md. 487, 77 A. 844, in which a number of cases are reviewed and in which the test of whether or not a claim is liquidated so that an attachment will lie is thus stated: "In each case the question is whether the contract itself fixes the amount or furnishes a standard by which the amount may be certainly determined."

In our case the debt, if any, owed by McBerry to Weston was uncertain and, therefore, would be considered "unliquidated." If, by contrast, both the existence of the debt and the amount of the debt were certain, to wit, "liquidated," the tender of any amount less than the full amount due, even if tendered "in full satisfaction of the dispute" and even if negotiated by the creditor, would not produce a binding accord and satisfaction. Such was the holding in the *Eastover* case itself.

> *The claim being liquidated* and undisputed, *it was not discharged by the payment of a lesser amount than that due.*

*Id.* (emphasis supplied).

This Court, through Judge Bloom, addressed the same distinction in *Air Power, Inc. v. Omega Equipment Corp.,* 54 Md.App. 534, 538, 459 A.2d 1120 (1983), as we spoke of the

Unless subsection (c) applies, the claim is discharged *if the person against whom the claim is asserted proves that the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim.*

The Official Comment to § 3–311 elaborates on the communicative fullness demanded by subsection (b).

*Normally the statement required by subsection (b) is written on the check.* Thus, the canceled check can be used to prove the statement as well as the fact that the claimant obtained payment of the check. *Subsection (b) requires a "conspicuous" statement that the instrument was tendered in full satisfaction of the claim.* "Conspicuous" is defined in Section 1–201(10). The statement is conspicuous if "it is

---

well settled general rule, of ancient lineage, that *a claim which is liquidated and undisputed is not discharged by acceptance of a lesser sum tendered in full settlement.* This is so because "[a] mere agreement to accept less than the real debt would be *nudum pactum."* "But if in addition to the part payment there be some other collateral consideration such as in law is sufficient to support a contract, then the agreement to relinquish the residue is not a *nudum pactum."* (Emphasis supplied).

In the case of an offer of part payment of a liquidated claim, there must be something else by way of a valid consideration before an accord and satisfaction may be found. In the case of a liquidated claim, such an offer of partial payment will not suffice because, in effect, it offers nothing that is not already indisputably due. There is thus no compromise. Judge Deborah Eyler pointed out, in *Wickman v. Kane,* 136 Md.App. 554, 561, 766 A.2d 241, *cert. denied,* 364 Md. 462, 773 A.2d 514 (2001) that one of the necessary conditions is that the parties entered into an agreement to compromise and settle the dispute by *the payment by one party of a sum greater than that which he admits he owes* and the acceptance by the other party of a sum less than that which he claims as due.

(Emphasis supplied).

In the case of a liquidated claim, a partial offer does not satisfy that requirement, for as Judge Eyler explained:

*[P]ayment of a claim* or debt that *one already is obligated to pay,* when the claim or debt is due and owing, ascertainable in amount, and not controverted, *will not serve as consideration for an accord.*

136 Md.App. at 563, 766 A.2d 241 (emphasis supplied).

All of this, however, is a very different context for a distinct subdivision of Accord and Satisfaction law and not the one in which we are operating in this case.

so written that a reasonable person against whom it is to operate ought to have noticed it."

(Emphasis supplied). See *Wickman v. Kane*, 136 Md.App. 554, 562–63, 766 A.2d 241, *cert. denied,* 364 Md. 462, 773 A.2d 514 (2001).

■ Section 1–201(10) of the Commercial Law Article gives us not only a definition of "conspicuous" but also an indication that the issue of adequate conspicuousness is a question of law for the court and not one of fact.

"Conspicuous", with reference to a term, means so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it. *Whether a term is "conspicuous" or not is a decision for the court.*

(Emphasis supplied).

13 *Corbin on Contracts* (Sarah Howard Jenkins Rev. Ed., 2003), § 70.2, pp. 308–09, also stresses the indispensability of unambiguous clarity in the tendering of an offer of accord.

*The process* of interpreting the words and actions of the parties and of determining the legal effect thereof *is the same for an accord as for any other contract.* In order for a performance rendered by an obligor to operate as a satisfaction of the claim against the obligee, it must be offered as the satisfaction to the creditor. *As with any other offer, an offer of an accord or the offer of performance must accompany expressions sufficient to make a reasonable person in the creditor's position understand that the performance is offered as full satisfaction of the original claim and not otherwise.*

(Emphasis supplied).

The Maryland caselaw offers bountiful illustrations of what constitutes an unmistakable offer of settlement so that the acceptance of that offer will produce an effective accord and satisfaction. In the classic case of *Scheffenacker v. Hoopes,* 113 Md. at 113, 77 A. 130, the letter accompanying the defendant's tender of a settlement check left no doubt as to the purpose of the tender.

*"I enclose a check* for three hundred and sixty-one dollars and twenty cents ($361.20), *intended to be in settlement of bill* for printing catalogues. You know my dissatisfaction with your work ... but *I do not wish a controversy, and rather than have one I am enclosing check* for ($361.20), one-half of your bill, *in full settlement* thereof. *If you do not care to accept such a compromise, do not use my check."*

(Emphasis supplied).

In *Mercantile Trust & Deposit Co. v. Rode,* 137 Md. 362, 377, 112 A. 574 (1921), the Court of Appeals quoted with approval from 1 *Ruling Case Law* 195 as to the clear and unequivocal character of the required communication:

*"To constitute an accord and satisfaction* in law dependent upon the offer of the payment of money, *it is necessary that the offer of money be made in full satisfaction of the demand or claim of the creditor,* and be accompanied by such acts or declarations as amount to a condition that if the money is accepted, *it is to be* in full satisfaction and *of such a character that the creditor is bound to understand the offer."*

(Emphasis supplied).

In the absence of an explicit statement that the tendered checks were offered in full satisfaction of the claims, the tendering of checks in that case was held not to have constituted an adequate communication of an offer to reach an accord.

[T]here remains *no evidence which compels the inference that the appellant received the checks* in question *in full satisfaction of his claims.* For in all the memoranda, invoices, telegrams and correspondence, *Robinson nowhere stated that the checks were sent in full and final settlement of Rode's claims.*

137 Md. at 377, 112 A. 574 (emphasis supplied).

In *Loh v. Safeway Stores,* 47 Md.App. 110, 112, 422 A.2d 16 (1980), the offer, as one in full settlement of the claim, was unequivocal.

[T]he insurer sent to the appellant's counsel a check in the amount of $1,000 which *the accompanying letter said* was *"intended to be in full payment of Mrs. Loh's claim."* The letter acknowledged that there was no mutually agreed upon settlement figure, but *the insurer stated "we want your client to have what we believe would be the full value of her claim."* The insurer did not admit liability, but, rather, sought an "amicable conclusion" to Mrs. Loh's claim. *The insurer's letter concluded with the comment that the check "represents the maximum value to us for settlement of this claim."*

(Emphasis supplied).

In that case, we emphasized the clarity with which an offer of an accord must be communicated.

[I]t is clear that, in Maryland, *when one party tenders a check* in settlement of a dispute, *making clear that the tender will satisfy the claim against the tendering party* if accepted, the party who accepts and uses the check, even though protesting against settlement, cannot make further claim against the tendering party. *Here, Garden State's letter made clear that the $1,000 check* tendered on November 21, 1977 *was "the maximum value to us for settlement of this claim."*

47 Md.App. at 116, 422 A.2d 16 (emphasis supplied).

In *Air Power v. Omega,* 54 Md.App. at 535, 459 A.2d 1120, this Court held that an offer to settle a claim was sufficient in a case in which a cashier's check in the amount of $18,085.61 contained, *on the face of the check, the words "Paid in full in settlement of all claims* between Air Power and Omega." An accompanying letter further stated:

*"We request and demand that you immediately notify all courts* and governmental authorities where you have filed notification of your claim *that you no longer have a claim* against OMEGA EQUIPMENT CORPORATION *and to*

*release* to OMEGA *any assets or other items seized by reason of your claim* or actions."

54 Md.App. at 536, 459 A.2d 1120 (emphasis supplied).

■ In *Kimmel v. Safeco Insurance,* the letter from the insurance company to the claimant accompanying a check for $20,000 stated in part, "Enclosed please find a release and payment of $20,000. This represents the amount recoverable under your SAFECO automobile policy." Judge Hollander, 116 Md.App. at 350, 696 A.2d 482, also described what was written on the face of the check.

> The check for $20,000 included information on its face that is relevant here. It contained pre-printed categories, including the loss date, the claim number, the policy number, the insured, the agent, and the coverage. All of the categories were completed by hand.... In addition, *the following phrase was handwritten under the line where the amount of the check was stated in words: "full & final payment of all claims."*

(Emphasis supplied). The creditor must have certain knowledge that a payment is intended to be in full satisfaction of the claim.

> [W]hen a claim is disputed, acceptance of payment, *coupled with knowledge that payment is intended fully to satisfy a disputed claim,* constitute an accord and satisfaction that bars any further recovery.

*Id.* at 357, 696 A.2d 482 (emphasis supplied).

The most unmistakable statement as to the required clarity of an offer of accord is that found in 6 A. Corbin, *Contacts,* § 1277 (1962), quoted with approval in *Washington Homes v. Baggett,* 23 Md.App. 167, 174, 326 A.2d 206 (1974).

> There must be accompanying *expressions sufficient to make the creditor understand, or to make it unreasonable for him not to understand,* that the performance is offered to him as full satisfaction of his claim and not otherwise.

(Emphasis supplied).

Some of our language in *Washington Homes v. Baggett,* 23 Md.App. at 176, 326 A.2d 206, however, does seem to cut

across the grain of this otherwise unbroken sweep of authority, in Maryland and elsewhere, on the communicative requirements of an offer of accord. The quality of the offer, however, was not the focus of *Washington Homes v. Baggett*. Our primary concern in that case and the heart of our analysis was on the cashing of tendered checks by the plaintiffs, to wit, on the effectiveness of the performance or satisfaction rather than on the quality of the antecedent accord.

The *Washington Homes* opinion went to great length to analyze a three-three split on the Court of Appeals in *Palladi Realty Co. v. Ohlinger*, 190 Md. 303, 58 A.2d 125 (1948), and to speculate on how that tie vote might probably have come out differently, had the modality of cashing the tendered check been different.

None of the judges said that the acceptance of the check did not constitute an accord and satisfaction. The division of opinion in the *Palladi* case was centered around the manner in which the check was cashed. *We glean from the above quoted language that had the check been cashed other than by the method employed, i.e., by endorsing it over to the clerk of the court, that the decision of the Court of Appeals would have been to the effect that the contract was terminated.* It is only the peculiar manner in which Ohlinger negotiated the check, representing a deposit of the refund, that caused the division.

In the case now before us there was no endorsement of the check to the clerk of the court; rather the checks were deposited into the respective accounts of Ehler and Krouse.

23 Md.App. at 175, 326 A.2d 206 (emphasis supplied).

Our concern in *Washington Homes* was not with the necessary quality of the offer of accord and the opinion, therefore, should not be read as an authoritative pronouncement on that aspect of an accord and satisfaction. The analysis, rather, concentrated on the act of cashing the checks and, in quoting 6 A. Corbin, *Contracts*, § 1279 (1962), stressed the absence of any word of dissent or dissatisfaction.

"The cashing, or the certification, of a check expressly sent in full settlement of a disputed claim, operates as an accord and satisfaction *if, at the time, no word of dissent is sent to the party offering it in satisfaction.*"

23 Md.App. at 175–76, 326 A.2d 206 (emphasis supplied). As the opinion then went on to talk about the check cashing *per se,* it again stressed the fact that the plaintiffs "did not communicate immediately their dissatisfaction with the cancellation and refund." *Id.* at 176, 326 A.2d 206.

By contrast, Weston in this case immediately protested every statement by McBerry declaring the Contract to be terminated. Weston's letter to McBerry of May 17, 2004, contradicted in detail McBerry's basis for having declared the Contract terminated in its letter of May 13. When McBerry again made reference to a termination in its letter of May 18, Weston countered with contradictory and detailed assertions in its reply letter of May 19. McBerry's letter of August 6 was similarly controverted by Weston's response of September 15. This was by no means the situation that had been before the Court in *Washington Homes v. Baggett.* It is not necessary to distinguish the two cases, however, because we do not deem any peripheral dicta in *Washington Homes v. Baggett* to represent an accurate statement of Maryland law on the required content of an efficacious offer of accord.

The national caselaw is fully supportive of our holding that nothing short of an unequivocal and unambiguous statement of an offer to reach an accord will suffice to establish an accord and satisfaction. In *Strother v. Strother,* 136 Idaho 864, 867, 41 P.3d 750, 753 (2002), the Court of Appeals of Idaho stressed that a mere inference of purpose will not suffice and that the purpose of accepting the check in full satisfaction of the claim must be expressly stated either on the tendered check itself or in the accompanying writing.

Because the fourth of these elements [that the instrument contain a conspicuous statement to the effect that it was tendered as full satisfaction of the claim] is not shown in the present case, Jeff's accord and satisfaction argument fails.

In order for acceptance of a check to create an accord and satisfaction, *the notation on the check or an accompanying writing must express in plain, definite, and certain terms that the debtor is giving such check in full satisfaction of the debt* and that acceptance thereof discharges the debt. *Neither Jeff's Check No. 2 nor the accompanying letter contained a plain, definite, and certain statement that acceptance thereof would settle the dispute* regarding Check No. 1.

(Emphasis supplied).

### The Check and Letter of August 6, 2004

When we examine McBerry's ostensible offer of an accord under that microscope, the offer is self-evidently flawed. On August 6, 2004, the attorney for McBerry sent to the attorney for Weston a check for $50,000.00. The check itself contained no indication whatsoever, on front or back, that it was being offered in full satisfaction of Weston's claim against McBerry. It contained no indication that if it were accepted or negotiated that it would represent a settlement of the claim. In terms of having any bearing on the subject of accord and satisfaction, the check itself was absolutely silent.

The accompanying letter from McBerry's counsel to Weston's counsel notified Weston of McBerry's intent to terminate the contract, giving for the first time as the reason for the termination the following provision of Paragraph 2(c) of the Contract:

In the event that Seller is unable to obtain such plat approval and recordation or any such approvals and permits so that the initial closing of the first five (5) lots hereunder can occur within two (2) years following the date of this contract, *or* if the Sellers inability to accomplish the same results in the delay and/or suspension of the takedown schedule at any time for two (2) years or more, [then] either party, by written notice to the other, shall have the right to terminate this Contract, *whereupon the deposit* (or the remaining balance thereof) *shall be returned to purchaser,* and neither party shall have any further rights or obli-

gations hereunder (except any rights or obligations which survive the termination of this Contract by the terms hereof).

(Emphasis supplied).

In its reply to the August 6 letter, Weston acknowledged "only receipt of the check, and not acceptance of it, as further discussed below." Later in the letter, Weston's counsel elaborated in that regard:

As there has been no *bona fide* basis for the termination of the agreement, and Weston continues to demand specific performance of the agreement in its pending lawsuit, *Weston will negotiate the check and place the funds in escrow with our firm so that they remain available to be used in accordance with Paragraph 2(b) of the Contract. Weston's negotiation of the deposit check shall therefore in no way be construed as acceptance of the return of the deposit or a waiver of any of its rights or claims asserted against McBerry.*

(Emphasis supplied).

Weston's reply letter also argued the insubstantiality of McBerry's ostensible reason for terminating the Contract.

*[T]he clause that you rely upon* as grounds for Seller's termination *is conditioned upon Seller being unable to obtain plat approval* and recordation. ...

In this matter, *there is no dispute that McBerry was not unable to obtain the plat approval.* In fact, *the plat was recorded.*

*Although McBerry delayed the initial closing* of the first five (5) lots, *it was not based upon any inability of McBerry to obtain plat approval and record the plat. As McBerry did,* in fact, *record the plat it cannot be heard to contend that the delay was* in any way *due to its inability to do so. The language that you quote* is therefore *simply not applicable.* Your reliance upon Paragraph 3(c) to terminate the

contract is unjustified, and hence constitutes further evidence of breach of the agreement by McBerry.

(Emphasis supplied).

The merits of the termination, however, are, for the moment at least, beside the point. Our immediate concern is the character of the tender. With respect to the check for $50,000.00, the sum total of comment in the August 6 letter accompanying the check consisted of the following three-sentence paragraph:

In as much as there has been more than said 2(two) year delay, *McBerry hereby terminates the Contract. Accordingly, enclose herewith the check* from Chapman, Bowling, & Scott, P.A., *for Fifty Thousand Dollars* ($50,000.00) payable to Weston Builders & Developers, Inc., *representing the deposit paid on the Contract.* As provided by Paragraph 2(c) of the Contract, Weston has no further rights or obligations under the Contract.

(Emphasis supplied).

Nowhere in that letter was there any suggestion that the check was being tendered in full satisfaction of Weston's overall claim or that Weston's acceptance or negotiation of the check would represent a settlement of the claim. In no sense, moreover, did the tendering of the $50,000.00 check represent any compromise on the part of McBerry. McBerry's optimal desire was for the Contract to be terminated. If the Contract were terminated, Weston's $50,000.00 deposit would have to be returned to Weston as a matter of course. McBerry was, by tendering the check, offering nothing beyond that which McBerry itself acknowledged was due.

Nor was McBerry's letter of August 6 by any stretch of the imagination an offer to settle fully the dispute between Weston and McBerry. Weston's Amended Complaint against McBerry had been filed on May 24, 2004, two and one-half months before the letter of August 6. In addition to seeking specific performance of the Contract, Weston's suit also had counts charging 1) an anticipatory breach of the Contract, 2) unjust enrichment, and 3) breach of the Contract, two of those

counts seeking damages in the amount of $3,500,000.00 and the other seeking damages in the amount of $2,000,000.00. Those additional counts were not abandoned until the last day of trial, on January 26, 2005. They were definitely a part of the case during the critical exchange of correspondence in the late Spring and Summer of 2004. The letter of August 6 made no mention of that suit or of any of its counts. As Weston's counsel pointed out in his reply letter of September 15:

> I feel that it is important to note that *your letter purports to give Notice of Termination without reference to the pending litigation.* As you entered your appearance to defend McBerry in that case, you are aware that *suit already has been filed based upon McBerry's prior actions that Weston contends already constituted a breach of the contract. Your effort to rely upon new grounds* to supplement McBerry's notice of termination *does not justify McBerry's prior actions* in refusing to settle on Lots and *does not cure McBerry's breach of the contract.*

(Emphasis supplied).

McBerry's letter of August 6, moreover, made it clear that McBerry was not offering to lay down any of the weapons in its litigational arsenal. The final paragraph of the letter was militant in tone:

> Further, *McBerry* is not waiving any defenses it has under the Contract by giving this notice and *is not waiving its election to terminate the Contract as provided by Mr. Scott's letter of May 13,* 2004, and expressly reserves all rights under the Contract.

(Emphasis supplied).

That is not the language of detente. Indeed, if McBerry made good on its continuing option "to terminate the Contract as provided by Mr. Scott's letter of May 13, 2004," it would have been asserting that Weston had been in default under the Contract, raising the real possibility that McBerry might demand the forfeiture of the very $50,000.00 it ostensibly refunded on August 6. That intransigent stance of August 6 is

in stark contrast with what our concluding survey of the national caselaw commends as a more appropriately conciliatory approach to negotiating an accord and satisfaction.

## An Offer of Accord Must Be Unequivocal and Unambiguous

In *Sanders v. Standard Wheel Co.*, 151 Ky. 257, 151 S.W. 674 (1912), the Supreme Court of Kentucky stated unequivocally that a permitted inference of an offer of accord will not suffice, and that an efficacious offer must be one that "is not susceptible of any other interpretation."

> *The tender* of a sum less than the contract price, in settlement of a disputed claim, *must be accompanied with a statement, not which **MAY** be understood by the creditor as intended to be in full settlement and satisfaction of the claim, but which **MUST** be so understood by him,* that is, *the statement must be so clear, full, and explicit that it is not susceptible of any other interpretation.*

151 S.W. at 676 (emphasis supplied).

Far from being an unambiguous offer of an accord, the language of McBerry in this case did not even rise to the level of ambiguity. An offer of accord was non-existent. This is why we are able to hold, as a matter of law, that the offered accord did not pass muster. As the proponent of the accord and satisfaction, McBerry bore the burden of proof. Even taking that version of the evidence most favorable to it,[10] there was no competent evidence from which a legally adequate offer of accord could reasonably be induced. McBerry failed, as a matter of law, to satisfy its burden of production.

## To Terminate a Contract and Return a Down Payment Is Not an Offer of Accord and Satisfaction

There are strong foreshadowings of the present case in *Durkin v. Everhot Heater Co.*, 266 Mich. 508, 254 N.W. 187 (1934). The defendant there, much as McBerry here, formally

---

10. Actually, the first-level facts were not in dispute. The exchange of correspondence spoke for itself.

notified the plaintiff of the termination of a contract of employment and, doing more than was done in this case, tendered a check "in full payment and satisfaction of all claims of any kind for compensation or otherwise which you may have against this Company." 254 N.W. at 188. Notwithstanding the resoluteness of the language, the amount of money represented by the check was actually only for the amount of unpaid salary that was due the plaintiff. The Michigan Supreme Court accordingly observed:

> *Nor was there any dispute* between the parties *that plaintiff* on September 1 *was entitled to payment* of a half month's salary *in the amount of $375.* Defendant's notation on the back of check was: "8–30–30. Salary last half August $375.00." *This notation was well calculated to lead plaintiff to understand that it was a payment of salary, and nothing else. It is wholly inconsistent with the construction that defendant would have the court place upon its letter* of August 27, i.e. that the check was not only intended to pay plaintiff's salary but also any other claim he might then have against the company or that he might have in the future as a result of defendant's breach of the employment contract. *If defendant honestly sought an accord and satisfaction, it could have and should have plainly advised plaintiff that acceptance of the $375 must be upon the express condition that it satisfied any claim for breach of the employment contract* which plaintiff might otherwise assert.

254 N.W. at 188 (emphasis supplied).

The defendant there offered nothing that was not due. Similarly, the $50,000.00 check in this case, as a refund of a deposit, gave nothing beyond that which, by its position of August 6, McBerry acknowledged was due to Weston. The Michigan Supreme Court was emphatic that one may not sculpt an unequivocal offer of accord and satisfaction out of such insubstantial clay.

> [I]n the letter itself the check was referred to as being in satisfaction only of such claim or claims as "you (the plaintiff) may have." The fair inference from this statement is

that it referred only to present claims and not to such unliquidated damages as might in the future accrue to plaintiff incident to the breach of his employment contract.

*To work an accord and satisfaction the tender of payment as being in full should be made in unequivocal terms, so that the creditor in accepting the conditional payment will surely do so understandingly.* Often, perhaps usually, transactions of this character are between laymen, and hence the law requires that *in order to accomplish an accord and satisfaction the statement that it is so intended must be clear, full, and explicit.*

254 N.W. at 189 (emphasis supplied). See also *Nationwide Insurance Co. v. Quality Builders,* 192 Mich.App. 643, 482 N.W.2d 474, 478 (1992).

The inadequacy of the offer of an accord in this case, moreover, was more than linguistic. The offer was substantively flawed as well. A check that represented nothing more than the return of a deposit was not what Judge Eyler was referring to in *Wickman v. Kane,* 136 Md.App. at 561, 766 A.2d 241, as "the payment by one party of a sum greater than that which he admits he owes." It was not what Judge Powers was referring to in *Jacobs v. Atlantco,* 36 Md.App. at 341, 373 A.2d 1255, as he quoted with approval from 1 C.J.S., *Accord and Satisfaction,* § 4 (1936 & Supp. 1976):

"Thus *consideration* for an accord and satisfaction *exists where something substantial which the debtor was not bound by law to do is done by him,* or where he abstains, at request of the creditor, from doing something which he has a right to do; it may consist in the performance of an act, or even the giving of a promise."

(Emphasis supplied).

McBerry offered to give up nothing. To return the down payment and be out from under the financially disadvantageous Contract was the maximum that McBerry hoped to achieve. We reiterate that an accord and satisfaction is contractual in nature, and in this case there was no *quid* in the ostensible *quid pro quo.*

Both of the inadequacies of the offer of accord before us are mirrored in the decision of the New York Court of Appeals in *Merrill Lynch Realty v. Skinner,* 63 N.Y.2d 590, 473 N.E.2d 229, 483 N.Y.S.2d 979 (1984). We find that case to be particularly persuasive, and we are, indeed, persuaded. The purchasers and the sellers there entered into a contract for the sale of a house. The purchasers made a down payment of $8,000.00. Subsequently, the sellers' attorney sent the purchasers' attorney the following notice of cancellation:

"Confirming our telephone conversation *please be advised that my client has elected to cancel the contract because of the fact that a firm mortgage commitment has not been obtained within the 60 day period as called for under the contract.*

"Enclosed you will find my check payable to the order of your client in the amount of $8,000.00 which sum represents the down payment."

473 N.E.2d at 230–31 (emphasis supplied). The purchasers cashed the check which they had received as the return of their down payment. *Id.*

The purchasers then brought suit for specific performance or, in the alternative, for damages. Relying on the cashing of the check, the sellers moved for summary judgment on the ground of accord and satisfaction. Their argument was indistinguishable from that now being made by McBerry in this case.

[T]he defendants moved for summary judgment, claiming that the cashing of the check constituted an accord and satisfaction. They noted that *it was accompanied by a letter in which the defendants' attorney had stated that* the check for their down payment was enclosed because *the defendants had decided to exercise their option to cancel the contract. The defendants contended that the plaintiffs could not accept the check without also accepting the condition, and that the contract was therefore canceled.*

473 N.E.2d at 231 (emphasis supplied).

The trial court denied the sellers' motion for summary judgment but, on appeal, the Appellate Division reversed,

holding that there had been an accord and satisfaction. The Court of Appeals, in turn, reversed the Appellate Division and assigned two reasons why there was no accord and satisfaction.

In our view *the Appellate Division erred* in two respects: first, *by concluding that the letter accompanying the check constituted a basis for an accord and satisfaction;* secondly, *and more fundamentally, by holding* in effect *that sellers who have decided not to perform a realty contract may* generally *require the buyers to relinquish their rights* under the contract *as a condition to the return of their down payment.*

473 N.E.2d at 232 (emphasis supplied).

What the sellers were arguing in *Merrill Lynch v. Skinner* is the linchpin of McBerry's argument in this case. McBerry does not contend that it ever *expressly* tendered the $50,000.00 check in full satisfaction of Weston's claim. Shifting predicates adroitly, it argues only that what it made unmistakably clear was its intention to cancel the contract. The New York Court of Appeals held, however, that a letter announcing the sellers' intent to cancel a contract is not *ipso facto* a letter offering to settle a dispute.

In the case now before us, *neither the check nor the letter accompanying it expressly stated that the check was offered in settlement of any outstanding dispute* arising out of the contract. *Nevertheless, the defendants urge that the transaction should be given this effect because the letter accompanying the check clearly states the defendants' intent to cancel the sales contract.*

. . . Thus by its terms, *the letter simply purports to exercise the defendants' rights under the contract. It does not offer to settle any dispute* or advise the plaintiffs that acceptance of the check will cancel the contract, even if the contract of sale would not entitle the defendants to cancel under the circumstances.

473 N.E.2d at 232–33 (emphasis supplied).

The $50,000.00 check of August 6 was, as its accompanying letter stated, nothing more than a return of Weston's down

payment. In holding that the tender of such a check, whatever is thereafter done with the check, cannot be the basis for an accord and satisfaction, we so hold for precisely the reasons expressed by the New York Court of Appeals in *Merrill Lynch v. Skinner.*

> *[T]he defendants should not be permitted to condition the return of the down payment on the plaintiffs' relinquishing their rights under the contract of sale.* As a rule a condition attached to *a check* requiring the recipient to surrender contractual rights *will not serve as an accord and satisfaction if the check simply represents a return of the recipient's own property. ...*
>
> . . . .
>
> ... [O]nce they refused to perform the contract by delivering the deed, there was no longer any basis on which they could claim that the money still belonged to them. *That is so whether their refusal to perform was justified, as they contend, or constituted a breach of the agreement, as the plaintiffs urge.* In either event *the defendants, having refused to perform the contract, had no right to retain the plaintiffs' down payment.*
>
> ... *[W]hen the seller simply returns the buyer's down payment, acceptance of the check should not be considered an accord and satisfaction* because the check constituted nothing more than a return of the buyer's own property.

473 N.E.2d at 233 (emphasis supplied). We are in complete agreement.

Holding as we do that there was no adequate offer of an accord by McBerry, it is unnecessary to address the question of whether, had there, *arguendo,* been an adequate accord, the placing by Weston of the check in its attorney's escrow account, would have amounted to a satisfaction of that accord. There was no accord and, therefore, self-evidently no accord and satisfaction. The case will be remanded to the Circuit Court for Charles County for further proceedings on the merits.

JUDGMENT REVERSED AND CASE REMANDED; COSTS TO BE PAID BY APPELLEE.